FRANK C. SEESTED v. POST PRINTING & PUBLISHING COMPANY, Appellant.—31 S. W. (2d) 1045.

Division One, October 14, 1930.

560

*Frank M. Lowe* and *Henry L. Jost* for appellant.

*R. R. Brewster, Watson, Gage & Ess* and *Madden, Freeman & Madden* for respondent.

RAGLAND, J.—Action for libel. The petition alleged that on November 2, 1921, the defendant was the owner and publisher of a newspaper, known as the Kansas City Post, then of a general circulation of over 150,000 copies in Kansas City, Jackson County, Missouri, and throughout the United States, and that on said date defendant published in said newspaper of and concerning the plaintiff the following defamatory article:

"The Post feels that it would be remiss in its duties if it did not again call attention, now that the great American Legion convention is closing, to the pro-German record of August Frederick Seested, general manager of the Kansas City Star, in the front yard of which the reviewing stand for the Legion's distinguished visitors was erected.

"The Post has told how Seested lived in this country forty years and never deemed it necessary to become naturalized until he was threatened with internment and his property was in danger of being seized by the alien enemy property custodian after we entered the war.

"It now desires to complete the case against Seested by reproducing records of Seested's contributions to the kaiser's war chest, which are on file in the government archives at Washington,

"These records show that Seested contributed at least $26,000, and that his brother Frank Seested, circulation manager of the Star, also gave to the imperial German Government $11,000.

"This information which has been in our possession since last week, was obtained when the department of justice, the intelligence department of the army, and the American Protective League seized the papers of those arch conspirators, Von Papen, Von Bernstorff and Von Igel, when they were trying to embroil us with Mexico and were conducting a campaign of destruction in our munition plants.

"One entry in the records of the heads of the German spy and propaganda organization in this country deals with the $26,000 contributed by August Frederick Seested and another with the $11,000 contribution of his brother.

"The entry concerning August Frederick Seested, obtained and copied, reads:

"'Seested, August F., general manager Kansas City Star, $26,000.

"'Data Sep. pymnts.

"'Md vi vb vppn.'

"Government investigators interpreted the entry to mean that Seested had contributed $26,000, and that the payment for September, year not given, had been made to Von Bernstorff, Von Papen and Von Igel, the initials being interpreted as follows:

"'Md—Made

"'Vi—Von Igel

"'Vb—Von Bernstorff

"'Vppn—Von Papen'

"The entry concerning Frank Seested is the same except for the amount.

"How did it happen that Kansas City permitted the reviewing stand to be erected at the Star, and Marshal Foch and General Pershing to be housed at the home of the Star's owner?

"The Post can only explain that Kansas City knew nothing about it until the last minute—that the plans were made secretly through the connivance of the local convention committee's chairman and kept secret until one week ago, and until after the reviewing stand was partly built.

"Why did not the Post give out the damnable indictment against Seested during the convention? Plainly and bluntly, because we were unwilling to ruin the convention, prevent the parade, and perhaps incite a riot. Anybody who knows the legion knows its explosive character."

The petition was filed November 19, 1921, to the December term, 1921, of the Circuit Court of Jackson County. As originally filed it alleged that defendant in publishing the article just mentioned intended, among other things, to cause it to be believed that plaintiff

"was guilty of the crime of treason," and by way of innuendo it further alleged that the meaning conveyed by the article was that plaintiff was an "arch traitor." The defendant answered, admitting that it owned and published the newspaper known as the Kansas City Post and that it published in its said newspaper on the date mentioned in the petition the article set out therein, but denying all other allegations. Shortly before the trial, at the November term, 1926, plaintiff by leave of court amended his petition by striking out the allegations that the defamatory article was intended to convey, and did convey, the meaning that plaintiff was guilty of the crime of treason, and that he was a traitor, and by inserting in lieu of the allegations so stricken out others to the effect that the article meant and charged that plaintiff was disloyal to the United States, that it branded him with disloyalty. To the petition as so amended the defendant refiled its answer to the original petition. The answer did not attempt to justify the publication, nor did it set forth any matter in mitigation.

The facts which the evidence on the part of the plaintiff tended to show may be briefly summarized as follows:

August Frederick Seested, mentioned in the publication complained of, and his brother Frank, the plaintiff, were born in Tundon, a small town in Denmark. The town was situated in territory which subsequently became part of the German Empire and is known as Schleswig-Holstein. They came to this country with their father who with his family settled in Kansas City in the year 1880 and there established a home; August was then about sixteen years of age and Frank nine. August had attended school in Germany; shortly after the family came to Kansas City he secured employment with the Kansas City Star as office boy and clerk; he was subsequently advanced in different positions in the business office of the paper until he became business manager. At the time of the publication in question he was the general manager of the Star.

The elder Seested on coming to the United States took out his first papers and in due course became a naturalized citizen. August assumed that he became a citizen through the naturalization of his father. In that belief he served on juries, voted at elections, and otherwise comported himself as one having all the rights, privileges and duties of citizenship. In 1916, however, persons offering to register as voters, if not native born, were required in this State, as perhaps elsewhere, to furnish documentary proof of naturalization. Mr. Seested found upon investigation that his father's naturalization had not been completed until after he, August, had become twenty-one years of age. He thereupon took prompt steps to establish for himself the legal status of citizen. This seems to have been accomplished by July 9, 1917.

Frank Seested attended school in Kansas City—"went through the Public School." His first and only employment, covering forty years, has been with the Kansas City Star. He began as a carrier on a newspaper route in Kansas City; at the time of the publication involved in this proceeding he was, and for twenty years prior thereto had been, the circulation manager, having charge of the circulation and distribution of the paper outside of Kansas City.

Both brothers were prominent in the civic affairs of Kansas City; neither of them participated, directly or indirectly, in any activity which was designed to further Germany's interests prior to our entering the World War, and neither thereafter, by word or deed, manifested any lack of patriotism or the slightest disloyalty to the United States. On the contrary, Frank Seested and the members of his family, his wife and son and daughter, entered whole heartedly into every movement that was organized to help us "win the war." His son was in the aviation service; his daughter, then a school girl, won a gold medal for the sale of the greatest number of Red Cross seals in a contest participated in by the school children of Kansas City.

During the years 1917 and 1918, and until May 11, 1922, all of the stock in the corporate defendant, Post Printing & Publishing Company, was owned by F. G. Bonfils and H. H. Tammen, of Denver Colorado; through such stock ownership they owned and controlled the Kansas City Post. On the date last mentioned they sold all of the assets of the defendant, including the Kansas City Post, to Mr. W. S. Dickey. Mr. Dickey paid for the Post $1,250,000.

During the period just referred to one A. F. Lorenzen, located at Chicago, was the representative of the Kansas City Post and the Denver Post, also owned by Bonfils and Tammen, in charge of the business of those newspapers in so far as their advertising in Canada and the United States was concerned. Lorenzen was also an officer in the American Protective League, a voluntary association organized soon after the entry of the United States in the war. He held the rank of captain. With respect to his duties and his territorial jurisdiction, he testified:

"I had to do with the American Protective League outside of the city of Chicago. My duties were general. I was not limited. In Kansas City and Jackson County my duties were general and covered operations in the entire country. It was my duty to report disloyalty or possible disloyalties of individuals who might have been put in the classification of being disloyal, or draft evaders, and deserters from the army. In fact, to report anything and everything of that character that was un-American and unpatriotic."

Charles F. Lorenzen, a brother of A. F. Lorenzen, was in charge of the Bureau of Investigation of the American Protective League,

with headquarters at Washington, D. C. In October, 1918, the latter mailed to the former the following document:

"Report made by: American Prot. League.

"Place where made: Chicago, Ill.

"In re: Augustus F. Seested, General Manager, Kansas City Star, Frank Seested, with Kansas City Star.

"At Chicago. Captain A. F. Lorenzen, A. P. L. Chicago, makes report as follows:

"About five months ago I filed information through proper channels, regarding August F. Seested, General Manager, Kansas City Star, a position which he has held for approximately twenty-five years or longer, to the effect that when the United States declared war on Germany he discovered that he was not an American citizen and to save his neck proceeded to the office of the authorities in Kansas City for the purpose of becoming naturalized. At this writing I do not know whether he was a declarant two years before we entered the war or not. It is my understanding that if he was not he could not legally, since the declaration of war, become an American citizen. If he was not a declarant, then it appears that someone had influence enough to set aside the Constitution of the United States or its laws to such an extent that he was made a citizen in some regular or irregular way.

"It would seem to me that it would be interesting to obtain the facts in connection with the foregoing.

"Furthermore, I was in Kansas City last week and while there obtained information which shows that both of the Seesteds had subscribed (I presume prior to our getting into the War) amounts of money for the German Government. This may have been for bonds or something else. While in Kansas City I copied the following:

" 'Seested, August F., General Manager, Star $26,000.

" 'Data Sep pymts

" 'Md vi vb v PPn

" 'Seested, Frank C., K. C. Star, $11,000

" 'Data Sep.'

"I interpret the above as follows: Md, as applied to August F. Seested, meaning Made

"Vi—meaning Von Igel

"Vb—meaning Von Bernstorff

"Vppn—meaning Von Papen.

"Under the guise of constructive criticism the Kansas City Star and Times (whose policies are directed entirely by August Seested) they have hammered the Administration regularly.

"There seems to be no doubt in the minds of those in Kansas City who happen to know considerably about the affairs of the

Seesteds but what they are decidedly pro-German and would go right up to the dead line to aid and comfort the enemy.

"In connection with it all it seems to me, therefore, that it is highly important to find out exactly how Mr. Seested became an American citizen after war was declared."

On October 19, 1918, Charles F. Lorenzen wrote a letter to Fred D. Pitt, at Kansas City, with reference to the subject-matter of the report just set out. Mr. Pitt was chief of the Kansas City division of the American Protective League. Upon receipt of the letter he conferred with A. T. Bagley, Division Superintndent of the Department of Justice in charge of the Kansas City office, with reference to the action, if any, that should be taken with respect to it. After such conference Pitt wrote a letter to the National Director of the American Protective League at Washington, and in the letter gave "my (his) personal views of the whole situation." That seemed to have ended the matter so far as the Kansas City authorities were concerned.

When the American Protective League was dissolved at the close of the war all of the papers and files in its possession were turned over to the Bureau of Investigation of the Department of Justice at Washington, D. C. They were there classified as "confidential files."

On October 27, 1921, A. F. Lorenzen, at his Chicago office, dictated and caused to be mailed to the advertising manager of the Kansas City Post, at Kansas City, the following letter:

"October 27, 1921.

"Mr. James R. Winter,
"Advertising Manager,
"Kansas City Post,
"Kansas City, Mo.
"Dear Jim:—

"I have read with much interest the October 24th and 25th issues of the Post containing the expose of Seested and the Star. Now then in the strictest confidence, I can say to you, that there is on file at Washington, either with the Department of Justice or Intelligence Department of the Army and the American Protective League which operated during the War as an auxiliary to the Department of Justice, reports which practically corroborate the charge made against Seested in the October 25th issue of the Post.

"One of these reports, I happen to know contains the following information as having been obtained, charging that both the Seesteds had subscribed amounts of money to the German Imperial Government and the following memoranda is reported to have been obtained and copied—

" 'Seested August F. General Manager, Star $26,000.

" 'Data Sep pymts.

" 'Md vi vb V Ppn

" 'Seested Frank C. K. C. Star $11,000

"Data Sep.'

"I interpret the above as follows:

"Md, as applied to August F. Seested, meaning Made

"Vi—meaning Von Igel

"Vb—meaning Von Bernstorff

"V Ppn—meaning Von Papen.

"The department of justice records also show that attention was called to August F. Seested not having been an American citizen, etc., as set forth in the October 25th issue of the Post. I do not know how valuable this information will be to the Post at this time, but please keep in mind the importance of the fact that under no circumstances can my name be used in connection with it or can the source of information be made known.

"AFL-k."

On November 2, following the mailing of the above letter the article of which complaint is made appeared in four editions of the Kansas City Post. It was conspicuously displayed on the front page of the paper in each. November 2, 1921, was the last day of the session of a convention of the American Legion then being held in Kansas City and there were in attendance at that convention 100,000 members of the Legion, and in addition many military leaders who had distinguished themselves in the Great War, including General Pershing and Marshal Foch.

On March 19, 1922, the defendant by publication in its said newspaper, the Kansas City Post, repeated its charge that there were on file in the archives in Washington, D. C. "documents purporting to show that August Frederick Seested, general manager of the Kansas City Star, and his brother Frank C. Seested, circulation manager of the Star, contributed money to the Imperial German Government."

Prior to the publication of the article which constitutes the basis of this suit the reputation of the plaintiff "as to being a loyal, upright American citizen" had never been questioned among his associates and acquaintances in Kansas City.

At the conclusion of plaintiff's case in chief the defendant obtained the following admissions for the record in the cause: The war with Germany was declared April 7, 1917; the seizure by the United States of papers from the persons of Von Igel, Von Papen and Von Bernstorff, if any, occurred in 1916. It then offered in evidence the original and the amended petitions filed in this cause, and also the petition filed in the United States District Court, sitting at Kansas City, in a case entitled, Frank C. Seested, plaintiff, v. Fred G. Bonfils, defendant, and rested.

The jury returned a verdict for plaintiff, assessing in his favor actual damages in the sum of $100,000 and punitive damages in a like sum—the full amount laid in the petition. Judgment was rendered in accordance with the verdict, and defendant has duly appealed therefrom.

Other record and evidentiary facts will be noted in the course of the opinion.

Following appellant's statement of the case, there are fifteen formal assignments of error: Those briefed and argued may be disposed of under the following heads: (1) The amendment of the petition, with leave, over defendant's objection; (2) the refusal of the court to give certain instructions designated as "C," "D" and "E," requested by the defendant; (3) the reception of evidence as to certain activities of members of plaintiff's family during the World War; (4) remarks of the court addressed to the defendant's counsel while the latter was addressing the jury; (5) prejudicial statements made by plaintiff's counsel in the closing argument; and (6) the excessiveness of the verdict.

I. Appellant's contention under this head is that the amendment of the petition, in the respects heretofore mentioned, effected a departure, and that the new cause of action alleged in the amended petition was barred by the Statute of Limitations, because sued on more than two years after the publication of the alleged libel. Appellant concedes, as it must, that if the article in question was libelous *per se* the amendment did not effect a change of cause of action. [Callahan v. Ingram, 122 Mo. 356, 26 S. W. 1020; Cook v. Globe Printing Co., 227 Mo. 471, 127 S. W. 332.] The immediate question for determination therefore is whether or not the publication was libelous on its face.

The appellant insists that the article is not a libel. Its counsel say:

"The gist of the article sued on is that plaintiff had made a contribution to the German Government and to its cause, to and through an organization of which Von Bernstorff, Von Papen and Von Igel were principal members, and that this fact was ascertained and became known when the Department of Justice seized the papers of said Von Bernstorff, Von Papen and Von Igel. It is an admitted record fact that such papers were seized in April, 1916, and that the United States Government was not at war with Germany until April 7, 1917. That such papers were seized, and that such seizure resulted in diplomatic conversations between the German and United States governments long prior to the latter's declaration of war against the former; that before the entry of our

Government into the World War a large percentage of our citizens sympathized with, and advocated and supported, the cause of Germany, including numerous persons prominent in official and non-official life, are all well known historical facts. Therefore, had plaintiff made such contribution to said parties for the purpose as stated in the article, it was something he had a perfect legal and moral right to do.''

May the article be fairly and reasonably so construed? or rather is that the interpretation that average newspaper readers would put upon it?

''As to whether the article is libelous *per se,* we must consider in our determination only the thought, idea, impression, or opinion conveyed to the reader by the publication, everything appearing in the article, be it in inference, insinuation, irony, ridicule, sarcasm, the friendly or unfriendly tone, its arrangement, form, and style. The court for such purpose becomes the lay person to whom it is addressed, and in arriving at the meaning everything appearing in or from the article which, unaided by extrinsic facts or circumstances, has a natural tendency to change, color, or formulate its meaning, must be considered. . . . The publication cannot be measured by its effect when subjected to the critical analysis of a trained legal mind; it must be measured by its natural and probable effect upon the mind of the average lay reader. The fact that the thought conveyed is by way of insinuation or inference of false acts or facts is immaterial.'' [Dusabek v. Martz, 249 Pac. (Okla.) 145, 146-7; see also Cook v. Globe Printing Co., supra.]

The central theme of the article is ''the pro-German record of August Frederick Seested, General Manager of the Kansas City Star,'' who ''lived in this country 40 years and never deemed it necessary to become naturalized until he was threatened with internment and his property was in danger of being seized by the alien enemy property custodian after we entered the war.'' It was written for the purpose of completing ''the case against Seested by reproducing records of Seested's contribution to the kaiser's war chest.'' It assumes to reproduce entries ''in the records of the heads of the German spy and propaganda organization in this country,'' to the effect that August Seested had contributed $26,000 and Frank $11,000, and that they had made payments of those sums to Von Papen, Von Bernstorff and Von Igel, who ''were trying to embroil us with Mexico and were conducting a campaign of destruction in our munition plants.'' It asserts that ''the information . . . was obtained when the Department of Justice, the *Intelligence Department of the Army* and the *American Protective League* seized the papers of those arch conspirators Von Papen, Von Bernstorff and Von Igel.'' The article as a whole plainly charges that

the two Seesteds had contributed money in aid of the activities of an alien organization in its efforts to embroil us with Mexico and at the same time destroy our munition plants. Has an American citizen the legal and moral right to do that, even if his country is not at war? There is another historical fact of which a court will take judicial notice. In 1916 the relations between the United States and Germany had become so strained, owing to certain tragic incidents of Germany's submarine warfare, that war between the two countries was threatening and almost inevitable. If the Seesteds, at such time and under such circumstances, contributed in aid of Germany's efforts to embroil their own country in war with another nation and at the same time destroy its means of making war, were they doing what they had a legal and moral right to do? Certainly such action would be regarded by all right thinking men as grossly disloyal, if nothing more.

But the article does not purport to deal merely with the pre-war conduct of the Seesteds. Considered as a whole, with all its implications and insinuations, it is clear that it was intended to convey, and did convey, to the average reader, the meaning that both August and Frank Seested, were disloyal during the war. The term "pro-German" had with us no invidious sense until after the declaration of war between the United States and Germany; after that event to apply the term to a citizen of this country was to brand him with disloyalty; that was what "pro-German" meant in 1921; and that is what it still means when used with reference to the sentiment and attitude of certain of our citizens during the war period. The author of the article desires to complete the case against the Seesteds: they are charged with having been "pro-German." The evidence in support of the charge, according to the article, is that they co-operated with a German spy and propaganda organization and contributed to the Kaiser's war chest. When? The discovery was made by the Intelligence Department of the Army and the American Protective League, agencies which were active only during the war. The Post was unwilling to give out the "damnable indictment" sooner because it was unwilling "to ruin the convention, prevent the parade, and perhaps incite a riot."

As the legal basis for its contention under this head, appellant asserts that an article charging one with doing that which he has a perfect right to do, is not libelous per se. But that is not the test of a libel. "It is not sufficient to answer to a charge of libel to show that the publication only accuses the plaintiff of having done that which he may legally do. It has never been the law that a publication, to be libelous, must accuse a person of having committed a crime or otherwise having violated some law." [Stevens v. Snow, 214 Pac. (Calif.) 968.]

"A libel is the malicious defamation of a person made public by any printing, writing, sign, picture, representation or effigy tending to provoke him to wrath or expose him to public hatred, contempt or ridicule, or to deprive him of the benefits of public confidence and social intercourse." [Sec. 3613, R. S. 1919.]

Any language fairly included in the statutory definition just quoted is libelous *per se*. [Cook v. Globe Printing Co., supra, l. c. 529.] "Defamation (in the sense used in the definition) includes the idea of calumny, aspersion by lying—the injury of another's reputation in that way." [Diener v. Publishing Co., 232 Mo. 416, 433, 135 S. W. 6.] Now there can be no doubt but that the false publication, whether it be construed as charging that plaintiff and his brother, immediately prior to our entrance into the war, aided and abetted a German spy and propaganda organization in its efforts to embroil us in war with Mexico and at the same time destroy our means of making war, or whether it be construed as charging him with disloyalty during the war, had a tendency to injure plaintiff's reputation and to expose him to public hatred and contempt and deprive him of the benefits of public confidence and social intercourse. The publication was therefore libelous *per se*. But notwithstanding that it was libelous *per se* as a matter of law, it was necessary under constitutional requirements that the jury find that it was a libel, in order to entitle plaintiff to a recovery therefor. [Patterson v. Evans, 254 Mo. 293, 162 S. W. 179.] This it did under proper instructions given at plaintiff's instance.

There was no error in permitting the petition to be amended in the respects indicated.

II. The defendant requested the court, and the court refused, to instruct the jury as follows:

"C. . . . if you find and believe from the evidence that the printed article aforesaid clearly and unmistakably had reference to sentiments and acts of preference for the German Government at any time prior to April 7, 1917, then your verdict must be for the defendant."

"D. The court instructs the jury that in passing upon the issues submitted by these instructions, it is your duty to take into consideration the historical fact that when the papers of Von Papen and Von Igel were seized by the American Protective League the American Government was on friendly and peaceful relations with the German Government, as well as the Mexican Government, and that no person could reasonably have understood from the printed article introduced in evidence that defendant charged, or intended to charge, plaintiff with being a spy in the service of said non-belligerent states."

"E. . . . You are therefore instructed that no statement contained in the printed article introduced in evidence and sued on here that clearly and unmistakably had reference to occurrences that transpired and sentiments entertained prior to the 7th day of April, 1917, concerning plaintiff's relations with, or his sentiments for the Imperial Government of Germany can be made the basis for an action in damages, and you must not consider any such statement or statements in passing upon any issue submitted in these instructions."

Under the views expressed in the preceding paragraphs, statements in the publication involved which "clearly and unmistakably had reference to occurrences that transpired and sentiments entertained prior to the 7th day of April, 1917, concerning plaintiff's relations with, or his sentiments for the Imperial Government of Germany," could be libelous, and therefore the basis of an action for damages. Instructions "C" and "E" were properly refused.

The alleged historical fact referred to in instruction "D" is **not a fact.** The American Protective League did not come into existence until after the declaration of war by the United States. But that is not the gravest fault of the instruction. It would have injected a false issue into the case: the issue submitted was whether the publication, unaided by extrinsic facts, was a libel as defined by the statute, and not whether it charged plaintiff with having been a spy. It was not necessary that the article charge plaintiff with having been a spy in order to be libelous.

The refusal of the instruction was not error.

III. Plaintiff testified that his son served the Government during the World War in the Aviation Service; that his wife was active in buying Liberty Bonds and Baby Bonds; and that his daughter sold Red Cross seals. During the giving of this  testimony numerous objections were from time to time interposed by defendant's counsel and were overruled by the court. All of the objections so made are fairly comprehended within the following:

"We certainly object to what Mr. Seested's family had to do with the war. This is a libel suit, and a libel suit is a personal matter. The courts have held that the question of a man's family cuts no figure here at all; does not enter as an element of damage or anything of that kind, and we are objecting to this line of interrogation as to what the family of Mr. Seested did during the war, for the reason that it is not competent and not material to prove any issues here. . . .

"Of course, he is getting in before the jury all he intends to get in. It does not have anything to do with the man's disloyalty, what the boy did. We have no charge of any kind against the boy."

The relations existing between a husband and father on one side and his wife and children on the other are such that it may reasonably be inferred that their conduct and activities, under the stress of war conditions, fairly reflected his state of mind with reference to such conditions. The evidence was therefore both relevant and competent as tending to establish plaintiff's loyalty during the war. "Although the falsity of defamatory matter is presumed, it is competent for plaintiff, if he so desires, to offer affirmative evidence showing its falsity." [37 C. J. 86.]

IV. Appellant complains that certain remarks of the court directed to one of defendant's counsel, while he was addressing the jury, were calculated to greatly prejudice it in the minds of the jury. The following excerpt from the record discloses the immediate setting of the occurrence:

"I regret, just as every other man regrets, lawsuits of this kind. It isn't any pleasure to me, but I undertake as best I can, to present my side of a situation. I wouldn't undertake, although I am satisfied that His Honor was mistaken in not permitting my friend, Bottom, to go into the question of this newspaper—

"MR. BREWSTER (interrupting): I object to counsel telling the jury that Your Honor's rulings are wrong.

"THE COURT: Did you do that, Mr. Lowe?

"MR. LOWE: I have to abide by them.

"THE COURT: Then abide by them and keep quiet—

"MR. LOWE (interrupting): Let's get the statement that the court made: 'abide by them and keep still.'

"THE COURT: I said: 'Abide by them and keep quiet about it.' Put it that way.

"MR. LOWE: You say it now.

"THE COURT: I did say it then and I won't have any impudence from you about it.

"MR. LOWE: I object to that and I now ask that the jury be discharged.

"THE COURT: The jury may step out of the court room.

"To which ruling and action of the court in failing to discharge the jury, the defendant then and there at the time duly excepted and still excepts.

"MR. LOWE: Let me prepare my affidavit. Give me a stenographer and time to prepare an affidavit. That is all I ask the court to do. Give a minute to prepare an affidavit.

"Thereupon the jury was excused from the jury room and the following proceedings were had out of the presence and hearing of the jury, to-wit:

"Mr. Lowe: Defendant now asks the court for thirty minutes in which to prepare an application and affidavit for continuance.

"The Court: The application will be refused.

"To which ruling and action of the court the defendant then and there at the time duly excepted and still excepts.

"Mr. Lowe: I ask that the jury be discharged for the reason that the court, in the presence of the jury, has stated to Frank M. Lowe, counsel for the defendant, that he wasn't going to have any more impudence from him.

"The Court: Yes, after you had distinctly contradicted the word of the court."

The evidence in this case could easily have been taken in three or four hours. Notwithstanding, the trial consumed four days. The defense interposed objections, many of them entirely devoid of substance, at every step. And the objections were frequently followed by arguments which developed into extended colloquies. This is pointed out as a possible explanation of the nervous irritation manifested by the court, and not for the purpose of excusing it. Some other conditions which featured the trial, as shown by the record, should also be taken into consideration. The defense, there being none in reality on the merits, was wholly technical and obstructive. The record gives an impression that is unmistakable that all through the trial defendant's counsel were clinging to the hope that at some time or at some place substantial technical error would creep in, necessitating a reversal of any judgment that plaintiff might obtain. We are not criticizing counsel: we express no opinion as to the propriety of the course pursued: we merely state the fact. It tends to show how the incident which was comparatively trivial at its inception developed through the colloquy between the court and counsel into quite a dramatic episode. We are of the opinion that if any prejudice resulted to appellant thereby, it was self-invited and should not operate to reverse the judgment.

V. During the closing argument by Mr. Brewster of plaintiff's counsel the following occurred:

"Mr. Brewster: Now, then, Mr. Lowe said, 'Well it didn't make much of an impression on you (plaintiff).' And he said, 'Oh yes, it did, it made a profound impression.' Then he added, he thought that if he was guilty of this charge he was a traitor to everything that he had stood for in this community. He had been working for the soldiers who were at the front, his little girl, now dead and gone, the very flower of his life, died before vindication had come to this man—

"Mr. Lowe (interrupting): I object to that statement.

"Mr. Brewster (continuing):—working in the interests of the young soldier boys—

"THE COURT (interrupting): Just a minute, Mr. Lowe wants to make an objection.

"MR. LOWE: I want to make an objection to the statement about his daughter, as it is not competent and isn't proper argument.

"THE COURT: Objection sustained.

"MR. BREWSTER: If Your Honor please, may I say that she lies at rest to-day and this young man lives to-day under the stigma of this charge?

"MR. LOWE: I object to this statement for the reason that this is a libel suit by Frank Seested and there is no other element of damage that can be raised or made except on his behalf.

"THE COURT: The objection will be sustained, and the statement withdrawn from the consideration of the jury."

Appellant's assignment goes to the reference to plaintiff's "little girl, now dead and gone, etc." The court not only sustained the objections of defendant's counsel, but withdrew the objectionable statements from the consideration of the jury. If appellant was of the opinion that those rulings of the court were not sufficient to destroy the prejudicial effect, if any, of the language used, it should have asked that the jury be discharged. Not having done so, it is precluded from now urging the matter as ground for reversing the judgment. [Anderson v. Sutton, 316 Mo. 1058, 293 S. W. 770.]

VI. The publication of the libelous article did not affect plaintiff's employment or in any wise disturb his relations with the Kansas City Star: on the contrary he subsequently received increases of salary. He suffered extreme humiliation and shame and was temporarily under a cloud of suspicion and distrust,—until this suit was brought exposing the mendacity of the publication. Those were the only elements of actual damages which the evidence tended to show that he had sustained. The compensatory damages awarded him by the jury were therefore clearly excessive. If the verdict in that respect is permitted to stand, a *remittitur* of at least $75,000 should be required. [Cook v. Globe Printing Co., supra.]

The award of punitive damages stands on a different footing: "the giving of actual damages is not a matter of discretion, but one of absolute right, and such damages are required to be measured by standards that make them, as far as it is humanly possible, an exact equivalent in money of the injury suffered, while on the other hand, the giving or withholding of punitive damages, as well as the amount thereof, lies wholly within the discretion of the jury." [Grier v. Railway Co., 286 Mo. 532, 542, 282 S. W. 454.] Unless therefore it plainly appears that there has been an abuse of such discretion a court is not justified in interfering with an assessment of punitive damages. With this in mind let us note and consider some of the facts of this case that stand out boldly.

The article in question was false: it was known to the appellant to be false, because the appellant itself concocted the falsehood; in order to give it the similitude of truth, the appellant planted beforehand a lying document of the same purport in the archives of the American Protective League; when the time seemed propitious to make deadly use of the deliberately planned libel, appellant caused the existence and whereabouts of the planted document to be discovered, casually as it were, and reported to it by letter. All was done pursuant to a scheme carefully and craftily laid out. Following the publication there was no retraction by appellant: on the contrary it republished the same libel, in effect, after this suit was commenced. On the trial there was no claim of privilege, and nothing was offered in mitigation.

It is apparent from the face of the libelous article that the appellant was striking primarily at the Kansas City Star; if the libel had been as effective as the article had forecast, the Star, in order to have weathered the storm of indignation aroused by it, would have been compelled to have severed all connections with the Seesteds. Appellant must have had this in mind and been entirely willing that plaintiff be disgraced and ruined and all that he had accomplished in life set at naught, if thereby the destruction or impairment of the prestige and influence of a competitor might be brought about.

Appellant was a million-dollar corporation, and it owned and controlled a metropolitan newspaper of large circulation, through and by means of which it committed the wrong. The duty which the jury was called upon to discharge in the award of punitive damages was to assess such a penalty as would be adequate to punish appellant and deter others of like minds and possessed of the same means of inflicting injury from perpetrating similar wrongs. Does an assessment of a penalty of $100,000, all the facts and circumstances considered, manifest an abuse of discretion? Courts are not endowed with any unusual or peculiar discernment in such matters. The test usually applied by them is whether the assessment is so excessive as to shock the "judicial conscience." The judicial conscience is presumed to be representative of the consciences of all judicially minded, right thinking men and women. Applying as best we may the test just referred to, we are unable to say that there was any abuse of the discretion lodged with the jury, so far as the assessment of punitive damages is concerned.

The judgment of the circuit court is affirmed, on condition that respondent within ten days from the date hereof enter a *remittitur* in the sum of $75,000 as of the date of the original judgment; otherwise, the judgment will be reversed and the cause remanded. All concur.