### GASKINS (SEESTED, Intervener) v. BONFILS et al.
### No. 9296.

District Court, D. Colorado.
Oct. 30, 1934.

See, also, 4 F. Supp. 547.

I. N. Watson, R. R. Brewster, T. J. Madden, John G. Madden, and Harry G. Kyle, all of Kansas City, Mo., Joel E. Stone, of Den-

834

ver, Colo., and Charles V. Garnett, of Kansas City, Mo., for plaintiff and intervener.

Robert L. Stearns, of Denver, Colo., and Henry L. Jost, of Kansas City, Mo., and Lewis & Grant, of Denver, Colo., for defendants.

KENNEDY, District Judge.

This is a suit in equity in the nature of a creditors' bill by which the plaintiff and intervener seek to follow the assets of the Post Printing & Publishing Company, a Missouri corporation, which passed into the hands of the stockholders of said corporation thereby defeating the rights of the plaintiffs in securing the satisfaction of their judgments, one recovered against said corporation in the United States court for the District of Missouri and the other in the state courts of Missouri. This suit as originally instituted named Frederick G. Bonfils as defendant, but during its pendency the said Bonfils died and the executors of his estate under his last will and testament were made defendants by appropriate court proceeding herein.

Upon the trial of the case the defendants Dome Investment Company and Post Printing & Publishing Company, a Colorado corporation, were dismissed out by consent of the parties, leaving as the remaining defendants the above-named executors and defendant Boma Investment Company, a corporation.

Issues having been joined by answers of the defendants, the case proceeded to final hearing. Of the pleadings, perhaps sufficient may be recorded in saying that the issues tendered by the bill and the answers in response thereto will be noticed in the presentation of facts and a discussion of the legal principles applicable to the disposition of the controversy.

Prior to 1917 Frederick G. Bonfils, Henry H. Tammen, and J. Ogden Armour entered into an agreement to establish and publish a newspaper in the city of Kansas City, Mo., to be known as the Kansas City Post. The publishing entity was known as the National Newspaper Association. In this enterprise it seems that Armour, for reasons which are explained by the evidence but probably immaterial in this controversy, desired not to be known as one of the proprietors or stockholders of the enterprise, and, until the events which led up to the matters here concerned, was not generally known to the public as having an interest in the newspaper. This business venture proved to be a losing one, and in 1917 the old company was dissolved and a new one known as the Post Printing & Publishing Company was incorporated under the laws of Missouri, which new corporation continued to publish the Post as before. With the advent of the new corporation as the publisher, the stock was issued substantially one-half to Armour and one-quarter each to Bonfils and Tammen, with qualifying shares for directorships issued to balance the aforesaid division, but the share holdings of said Armour were represented by a stock certificate issued to Bonfils and Tammen jointly, transferred by indorsement in blank by the face holders, and deposited with Armour. The new company took over the entire assets of the old company, and notes of the new company were issued in the sum of $750,000, presumably to cover the acquisition of the assets of the old company and to represent the losses previously incurred by the stockholders while operating as the newspaper association. These notes were divided so that the indebtedness thereby represented would run one-half to the Armour interests and were so delivered. In 1918 the Boma Investment Company was organized by Bonfils as a corporation and shares of Bonfils in the Post Company were thereafter assigned by him to the Boma Company but not transferred on the stock books. The Boma corporation was largely a holding company for Bonfils' interests of various kinds. The evidence tends to show that at the time of his death he held 75 per cent. of the stock and the other members of his family the remaining 25 per cent. During this entire period Bonfils and Tammen and others holding qualifying shares were directors of the Post Company and continued to direct and manage its affairs while it remained a going concern. The enterprise under the new organization proved to be successful and profitable. In 1922 the corporate name was changed from the Post Printing & Publishing Company to the Star Printing & Publishing Company.

In 1920 the complainant, Florence Gaskins, filed her suit for judgment hereinbefore referred to against the Post Company based upon a libelous publication. This suit, after a number of delays occasioned by a variety of circumstances, was brought to trial, resulting in a verdict and judgment in favor of the plaintiff for $32,500 on December 15, 1926; the amount of said judgment and costs being $32,537. In 1921 the intervener, Seested, instituted a suit against the Post Company on account of a libelous article appearing in its publication which likewise on November 18, 1926, resulted in a judgment against the company for $200,000, but upon appeal to the Supreme Court [Seested v. Post Printing &

Pub. Co., 326 Mo. 559, 31 S.W.(2d) 1045] was reduced to $125,000 and costs amounting to $125,167.15. Executions were issued upon these judgments and returned nulla bona. Previous to this, however, and in 1922, the Post or Star Company negotiated a sale of all its assets to one W. S. Dickey for the sum of $1,250,000, who entered into possession of the property of the company, and the then owners ceased to operate in the publication of the paper or the business of the company further than to liquidate its assets. The purchase price to be paid by the purchaser was evidenced by notes maturing over a period of about four years; the last-maturing obligation being in June, 1926. In addition to this purchase price, there were other assets of the company consisting of interest paid by the purchaser, money on deposit in banks, Liberty bonds, and accounts receivable, which, although the evidence is somewhat in dispute as to the exact amount of these assets, fairly shows that they aggregated the sum of $1,873,034.11. A distribution of these cash assets then followed in due course. First, it appears that the indebtedness of the company, including the $750,000 hereinbefore mentioned, was liquidated and the balance divided one-half to the Armour interests and one-quarter to the Bonfils and Tammen interests. A past salary item of $24,500 each was allotted to Bonfils and Tammen, representing compensations and salary for services which, however, was taken out of the one-quarter distributive share of the Bonfils and Tammen interests and no part out of the Armour interest. The balance remaining of the so-called Bonfils interests was distributed by his direction to the Boma Investment Company and the Tammen interest either to himself or some company under his direction. At the negotiations for the purchase and sale of the property, the Post or Star Company was represented by Bonfils and Tammen and perhaps others holding directors, and at the time, so far as the stock books of the company were concerned, the capital stock was, with the exception of qualifying shares, held by Bonfils and Tammen, approximately one-quarter in each name and one-half in the names of Bonfils and Tammen jointly. Likewise Bonfils and Tammen, principally Bonfils as shown by the evidence, directed the distribution of the funds of the company through the First National Bank of Kansas City, where such funds had been held in trust under an escrow agreement. After this distribution, income tax complications arose which necessitated the return of some of these proceeds for the liquidation of income taxes, and Bonfils' share of these taxes so returned amounted to $15,049.85. According to the computation submitted by plaintiffs' counsel in their brief, after the deduction of this amount for income taxes, the amount paid to Bonfils as aforesaid for salary, and of all the Post Company debts including those represented by the $750,000 in notes with interest, the Bonfils interests (so called) received a net amount of $157,387.74. My recollection is that the latter figure was not in dispute between the parties at the final hearing.

No attempt has been made to give other than a running sketch of the principal facts which underlie the proceeding before the court. Pressure of time forbids more extended elaboration and to go further into detail would unduly prolong this memorandum; its only purpose being to indicate a reason for the court's conclusions and to establish a basis for appropriate findings of fact and conclusions of law.

One of the points in dispute is as to whether or not the instant proceeding is appropriate for the relief sought. Taking the bill as a whole, I analyze it as a true creditors' bill in which it is sought to follow assets of a defunct or insolvent corporation into the hands of those who have received the proceeds. No attempt has been made by this suit to attack the interests of owners of stock in the Post Company other than those of the deceased defendant, Bonfils. Such a suit involves a joint and several liability, and assets may be followed into the hands of any stockholder in which they may be found. Pierce v. United States, 255 U. S. 398, 41 S. Ct. 365, 65 L. Ed. 697. Therefore the complainants had the right to select Bonfils as the sole party against whom relief should be sought without joining other stockholders of the Post Company.

A suit of this nature has been recognized generally under circumstances similar to those in the case at bar, whether such circumstance be brought about by the repeal of a charter, transfer of assets to a new organization, insolvency, or other inability to pay its debts. In Curran v. State of Arkansas et al., 15 How. 304, at page 311, 14 L. Ed. 705, the following appears: "Whatever technical difficulties exist in maintaining an action at law by or against a corporation after its charter has been repealed, in the apprehension of a court of equity, there is no difficulty in a creditor following the property of the corporation into the hands of any one not a bona fide creditor or purchaser, and asserting his lien thereon, and obtaining satisfaction of his just debt out

836

of that fund specifically set apart for its payment when the debt was contracted, and charged with a trust for all the creditors when in the hands of the corporation; which trust the repeal of the charter does not destroy. Chancellor Kent, in 2 Com., 307, n., says, 'The rule of the common law has in fact become obsolete.' It has never been applied to insolvent or dissolved moneyed corporations in England. The sound doctrine now is, as shown by statutes and judicial decisions, that the capital and debts of banking and other moneyed corporations, constitute a trust fund and pledge for the payment of creditors and stockholders, and a court of equity will lay hold of the fund, and see that it be duly collected and applied."

In Sawyer v. Hoag, 17 Wall. 610, 623, 21 L. Ed. 731, the court expresses itself as follows: "But after all, this artificial body is but the representative of its stockholders, and exists mainly for their benefit, and is governed and controlled by them through the officers whom they elect. And the interest and power of legal control of each shareholder is in exact proportion to the amount of his stock. It is, therefore, but just that when the interest of the public, or of strangers dealing with this corporation is to be affected by any transaction between the stockholders who own the corporation and the corporation itself, such transaction should be subject to a rigid scrutiny, and if found to be infected with anything unfair towards such third person, calculated to injure him, or designed intentionally and inequitably to screen the stockholder from loss at the expense of the general creditor, it should be disregarded or annulled so far as it may inequitably affect him."

In Northern Pacific R. Co. v. Boyd, 228 U. S. 482, at page 502, 33 S. Ct. 554, 559, 57 L. Ed. 931, the Supreme Court, speaking through Mr. Justice Lamar, says: "And though the corporate property is thereby transferred to a new company, having the same shareholders, the transaction would be binding between the parties. But, of course, such a transfer by stockholders from themselves to themselves cannot defeat the claim of a nonassenting creditor. As against him the sale is void in equity, regardless of the motive with which it was made. For if such contract reorganization was consummated in good faith and in ignorance of the existence of the creditor, yet when he appeared and established his debt, the subordinate interest of the old stockholders would still be subject to his claim in the hands of the reorganized company. Cf. San Francisco & N. P. R. Co. v. Bee, 48 Cal. 398; Grenell v. Detroit Gas Co., 112 Mich. 70, 70

N. W. 413. There is no difference in principle if the contract reorganization, instead of being effectuated by private sale, is consummated by a master's deed under a consent decree."

In Pierce v. United States, supra, in construing the matter of an uncollected judgment penalty, Mr. Justice Brandeis, at page 402, of 255 U. S., 41 S. Ct. 365, 366, says: "The corporation cannot disable itself from responding by distributing its property among its stockholders and leaving remediless those having valid claims. In such a case the claims after being reduced to judgments may be satisfied out of the assets in the hands of the stockholders. *There is no good reason why the rule should be limited to judgments arising out of civil proceedings.*" (Italics ours.)

This emphasized language fairly assumes that the remedy is available in cases like this which arise on the ordinary civil side of the court.

But the defendants contend that this suit is in its nature one to enforce a stockholder's statutory liability under the laws of the state of Missouri and that therefore the general rules do not apply, but that obligations of this character are not under the rulings of the courts of that state recognized as true debts within the meaning of the Constitution and statutes. This contention would give more trouble should this court conceive that the remedy sought is to enforce a statutory stockholder's liability under the laws of that state. Even were this contention to be analyzed further, it would appear that there are Missouri decisions which would now include such a liability within the general scope of debts of a corporation. I shall not follow this analysis further, but conclude that the suit at bar is not of such a class.

It is again contended by defendants that the claims and judgments involved here are not lienable on and payable from the distributive corporate assets, upon the ground that the claims sounding in tort and not perfected by judgment prior to distribution cannot be the basis of recovery. Whatever may have been the conclusion were this a stockholder's liability suit, I am of the opinion that it cannot be maintained in a suit of this nature. This is supported by Phillips v. Commissioner, 283 U. S. 589, 51 S. Ct. 608, 75 L. Ed. 1289, Pierce v. United States, supra, and Creekmore v. Overton (C. C. A.) 27 F.(2d) 504, and has virtually become the law of this case by the decision of the presiding judge of

the Colorado District in Gaskins v. Bonfils, 4 F. Supp. 547.

It is asserted by the defendants that the suit may not be maintained against the executors of Bonfils because the so-called proceeds of distribution were in no sense received by Bonfils. Upon this point, it is true, the evidence is somewhat in conflict, but sufficient appears, in the opinion of this court, to justify a holding that these proceeds were received by him both directly and indirectly through his personal holding company, the Boma Investment Company. This conclusion is based upon more than a scintilla of evidence. Bonfils personally negotiated the sale of the assets to the Post Company, ratified them while acting as a director, and ordered their distribution. His eligibility as a director was attributable in a legal sense to the stock which stood upon the books of the company in his name. There is evidence that the Boma Company was organized by him as a personal holding company for the purpose of facilitating the management of his personal property and securing the more equitable method of paying income taxes. In complying with the statute requiring publication of names of owners and publishers of newspapers, the required legal publication of this data in the Post itself set forth that the Boma Company was the holder of shares of stock in trust for Bonfils. It could not be a bona fide company holding this stock in his own right and at the same time holding it in trust for Bonfils. By this voluntary public statement he advised the public that he was the equitable owner of the stock. Other evidence appears in the record which tends to fortify this conclusion. It is true that a certificate of stock is prima facie evidence of its ownership in the hands of the party holding it indorsed in blank, but this rule is not a hard and fast one and may be superseded by evidence of actual fact which justifies a contrary conclusion, as I believe it does in this case.

The defendants further contend that the suit here is premature in that it must be preceded by a suit upon the judgment against the defendant in the jurisdiction where the creditors' suit is brought. This is a correct statement of the law under ordinary circumstances. The exception is set forth in National Tube Works v. Ballou, 146 U. S. 517, 13 S. Ct. 165, 36 L. Ed. 1070, in that it may be made to appear that it is impossible to obtain a judgment in any court within the jurisdiction. It is frankly admitted by counsel that the Post or Star Company never qualified to do business in Colorado where this suit is brought, nor did it ever conduct business in such jurisdiction. The authorities are numerous that under such circumstances a legal service could not be secured in a foreign district by an attempted service upon any officer or director of the corporation. So that the institution of such a suit would have been a vain thing and equity will not require it.

The principal remaining point raised by the defendants for consideration is alleged laches on the part of the complainants. While this defense is not specifically raised by the pleadings, I have frequently held, and such holding is supported by good authority, that this is not necessary. In Hays v. Port of Seattle et al., 251 U. S. 233, 40 S. Ct. 125, 64 L. Ed. 243, the ruling of the court is fairly set forth in the syllabus in the following language: "In the federal equity practice the defense of laches need not be set up by plea or answer but may be taken advantage of either by demurrer or upon final hearing."

Reverting to a consideration of the evidence, the court is unable to say that there is a sufficient justification to hold that the complainant and intervener have been guilty of such laches as would defeat their right to recover here. Delays were occasioned in bringing the original cases to trial in the Missouri courts, but such delays were satisfactorily explained; likewise the delays which preceded the filing of the suit at bar. None of these delays in my opinion caused the defendants to change their position. In Northern Pacific R. Co. v. Boyd, supra, at page 509, of 228 U. S., 33 S. Ct. 554, 562, the court expresses the thought as follows: "But the doctrine of estoppel by laches is not one which can be measured out in days and months, as though it were a statute of limitations. For what might be inexcusable delay in one case would not be inconsistent with diligence in another, and unless the nonaction of the complainant operated to damage the defendant, or to induce it to change its position, there is no necessary estoppel arising from the mere lapse of time. Townsend v. Vanderwerker, 160 U. S. 171, 186, 16 S. Ct. 258, 40 L. Ed. 383."

The plaintiffs earnestly urge: (1) That the payment of the $750,000 indebtedness represented by the notes of the Post Company to the stockholders should not be recognized as obligations in considering the equities of the plaintiffs in this case, but, taking the evidence as a whole it would seem that this indebtedness manifested and recognized prior to the commencement of the libel suits should be fairly considered a legitimate indebtedness which Bonfils and his associates

had the right to satisfy out of the proceeds of the liquidation; (2) it is contended that Bonfils should be held for the amounts paid the other stockholders because of his position as a director in authorizing the payment; and (3) that all amounts paid to himself whether for salary or used in the settlement of income taxes should not be deducted. In the absence of specific evidence of fraud, I am inclined to believe that the law does not go so far as to charge the party who is instrumental in distributing liquidating assets with such a liability. Of course, it may be assumed that the plaintiffs had the right to attempt a satisfaction of their judgments against other stockholders who received liquidating dividends, but that feature is not in this case. Innocent stockholders who received liquidating dividends could probably not be required to make contribution. It would seem to be the rule that in effecting liquidation of corporate assets to the stockholders they would have the right to pay all legitimate indebtedness which might properly include compensation due and owing to themselves, without waiting for the liquidation of claims. In this respect they should not be considered within the language of the cases as enriching themselves at the expense of other creditors. But such assets as are distributed to stockholders in the nature of liquidating dividends are considered as being held in trust and may be followed by any creditor into the hands of him who may have received them. Curran v. State of Arkansas, supra. In this case it appears that Bonfils and his holding company received $157,387.74 over and above all amounts used in the discharge of obligations of every kind and nature, including those running to himself for compensation; and for such amount the plaintiff and intervener are entitled to a recovery from the executors and the Boma Company, jointly and severally, in satisfaction of their respective judgments. The amount of the Gaskins judgment is $32,537 and of the Seested judgment $125,067.15. In the allocation of the fund upon which the recovery is based, Gaskins should be entitled to a decree and judgment for $32,486.13, and Seested for $124,901.61, with costs to be taxed. (If these amounts, hastily computed, are not accurate, they may be made correct in the findings.)

Inasmuch as the amount recovered is insufficient to cover any interest, this item need not be considered.

Findings of fact, conclusions of law, and an appropriate decree may be submitted by counsel for the plaintiff and intervener in collaboration with counsel for defendants in harmony with the foregoing conclusions reached by the court, which may be supplemented by such additional findings and conclusions as are not inconsistent with the views herein expressed, within thirty days from date of this memorandum, reserving in such findings and conclusions proper exceptions to both sides as the basis for formal appeals.