## STUART v. PRESS PUB. CO.

(Supreme Court, Appellate Division, First Department. May 22, 1903.)

1. NEW TRIAL—DISCRETION—REVIEW.

Where the order granting a new trial expressly showed that it was granted in the exercise of the trial justice's discretion, as well as on exceptions, and because the damages awarded were inadequate, it should be affirmed.

2. SAME—GROUNDS—INSTRUCTIONS—SUBMISSION.

Where, owing to the nature of a colloquy between counsel and the court during the summing up, and by reason of the fact that documents and series of requests to charge were read, discussed, modified, and charged, it was extremely doubtful whether the jury fully understood the propositions of law intended to guide them, it was proper for the court, in the exercise of its discretion, to grant plaintiff a new trial.

3. LIBEL—INADEQUATE DAMAGES.

Where, in an action for libel, the evidence showed that the publication was libelous per se and was without justification, and that plaintiff was a man of good reputation, the court was justified in setting aside a verdict for six cents damages and granting a new trial, under Code Civ. Proc. § 999, authorizing the judge presiding at the trial, in his discretion, to entertain a motion on his minutes at the same term to set aside a verdict for insufficient damages.

4. SAME—JUDICIAL PROCEEDING—PRIVILEGE.

Where a newspaper publication, which was libelous per se, was not a fair report of a suit for divorce which had been brought, in which plaintiff had been named as a co-respondent, but contained, in addition, many statements, derived from unsubstantiated sources, derogatory to plaintiff's character, the libel, as a whole, was not privileged, under Code Civ. Proc. §§ 1907, 1908, providing that an action cannot be maintained against a newspaper for publication of a fair and true report of any judicial proceeding, without malice, except for a libel contained in the heading of the report, or other matter added which was not a part thereof.

5. SAME—BURDEN OF PROOF.

Where articles published in a newspaper concerning plaintiff were libelous per se, the burden of proving that such publications were privileged was on the defendant.

6. SAME—EXTENT OF PRIVILEGE.

Under Code Civ. Proc. §§ 1907, 1908, providing that actions for libel cannot be maintained against a newspaper for publishing fair and true reports of judicial proceedings, without malice, etc., the privilege thereby afforded is not limited to contested proceedings in open court, but extends to all judicial proceedings, and applications, ex parte or on notice, made to magistrates, judges, or courts for judicial action.

Van Brunt, P. J., dissenting.

Appeal from Trial Term, New York County.

Action by Edmund A. Stuart against the Press Publishing Company. From a judgment granting plaintiff's motion for a new trial on the minutes of the court after a verdict for plaintiff for six cents damages, defendant appeals. Affirmed.

The action is for libel. The plaintiff was a married man, 41 years of age; a resident of Passaic, N. J.; a clerk in the employ of the Erie Railroad Company, having charge of its advertising department; and was well and favorably known in church, club, and social circles. The defendant was the publisher of the World, and the alleged libelous articles were published in the morning and evening editions on the 23d day of August, 1900, and in the

¶ 5. See Libel and Slander, vol. 32, Cent. Dig. § 279.

morning edition on the 25th and in the Sunday edition on the 26th of the same month. The first article stated that an action for divorce had been commenced by James K. Knowlden, also a well-known resident of Passaic, against his wife, who was a school-teacher, and connected with various religious organizations, some of which were named; that "the affidavits accompanying the divorce papers charged her with improper conduct" with "Edward A. Stewart," whose business and residence were so described as to clearly indicate the plaintiff; that the information contained in said affidavits was furnished by a private detective named, and by one Scott, Mrs. Knowlden's brother-in-law; that Mrs. Knowlden emphatically denied the charge; that "Stewart" stated he did not know her, that he was positive there had been a mistake, and that his name had been dragged into the matter "without any right whatever." The second article stated, in effect: That Mrs. Knowlden was charged by her brother-in-law and the detective (naming them) with improper conduct with "Stewart," again so described as to indicate that plaintiff was intended. That she denied knowing him, and said concerning the charge: "I swear I am innocent. There has been a terrible mistake." That "the woman's accusers claim they shadowed her and 'Stewart'; saw them meet in the City Hall Park at Passaic, and walk out to an old well near the baseball ground. The detective crept under a fence and confronted the pair. The man fled." That Knowlden had made the allegations of the detectives the charges in his suit for divorce. That Rev. M. Leavans, Mrs. Knowlden's pastor, believed her guiltless, as did many others "who followed her lead in church work." That the plaintiff not only denied knowing Mrs. Knowlden, but said he was at home with his wife and children on the evening in question. The third article stated: That the conviction was growing among the friends of Mr. and Mrs. Knowlden in Passaic "that a terrible mistake has been made. It is believed that the detective and a brother-in-law who submitted the affidavits were mistaken in the identity of the couple." That Knowlden still clung to the proof furnished by the detective, despite the changing opinion of others, and asserted that he had evidence that was very convincing, and that his wife and her friends must prove that the stories were not true. That, in the papers filed in the divorce suit, Mrs. Knowlden was accused, in addition to improper conduct, with having received "diamonds and clothes" from the plaintiff—and reiterated that the plaintiff denied knowing either of the parties, and declared that he was at home at the time of the alleged misconduct. Sensational headlines, in large type, drew attention to the fourth article, the body of which commenced as follows: "No divorce petition has ever caused such a sensation in Passaic as the one filed recently by the attorneys for James K. Knowlden in the chancery court at Trenton"—and further stated, in substance, so far as material to this appeal: That the "charges against Mrs. Jennie Fields Knowlden had rent the town into factions. Her position in church work and society is so high that the affidavits of two amateur detectives have failed to shake the faith in her of a great majority of the men and women who know her." That "many say that Knowlden has been grossly deceived about his wife." That her pastor took up her defense, and thinks she is a victim of "mistaken identity." That Knowlden suspected his wife, and the detective and her brother-in-law followed her, on the evening referred to in the first article, from her home to where she met plaintiff, on Passaic avenue. And under a subheading, "What the Detectives Allege," it is stated that the plaintiff, whose Christian name is there correctly given, and Mrs. Knowlden, passed out the avenue, and, near Mead avenue, turned into a field, and sat down by an old well; that the detective followed them, crawled through the grass to within 12 feet, and confronted them, whereupon plaintiff fled, but, upon Mrs. Knowlden calling him, he rejoined her; that the detectives that night made affidavit of what they saw and heard, stating facts indicating intimate personal acquaintance for many years; and that they could not be mistaken as to the identity of the parties. The article referred to the plaintiff's business, to his marriage, his membership in the Passaic Whist Club and Passaic Club, and to the fact that he was an amateur actor. It referred to trouble between Mr. and Mrs. Knowlden concerning property, which extended to other relatives; set forth the transaction from which Knowlden first became suspicious

of his wife, intimating that she was innocent; stated that Knowlden employed detectives to watch and follow her; and contained a long interview with her, reasserting her innocence, and indicating that the affair resulted from family trouble, which engendered jealousy on the part of her husband without cause. It also reiterated the plaintiff's denial of the charges and of his acquaintance with Mrs. Knowlden, and stated that his friends believed him innocent. It also recited that Mrs. Knowlden seemed a modest woman, had been respected by all who knew her, had been a useful and influential member of society and in religion, and that the friends whom she claimed to have visited and seen on the evening when misconduct was charged against her corroborated her story, but that they could not tell how long she was away from the house, and her "whole defense rests on this point." It reiterated Knowlden's charge that his wife and her friends must clear themselves, and stated that his attorney said: "There is not a break in the evidence. We have two affidavits, and several witnesses in reserve, who are positive in their testimony. We can prove frequent meetings. The church people wanted to settle the case. They have filled this office nightly." The article also stated that other people saw a young couple, shadowed by two men, pass in the direction where it is claimed the plaintiff and Mrs. Knowlden went, and heard voices in the field, but that the man was not Stuart, and that Mrs. Knowlden's lawyer said that she could prove that she did not know the plaintiff, and never was near the ball grounds, and that it was a case of mistaken identity. The article further stated that either Knowlden or his wife must stand a church trial in the First Presbyterian Church, to which they belonged, as both could not remain communicants. This last article was illustrated with pictures of Knowlden, his wife, their pastor, and their church, reproduced from photographs.

The amended answer of the defendant admitted that it was a domestic corporation, but put in issue the other allegations of the complaint, pleaded matter in mitigation and that the articles were privileged, but did not justify.

The material allegations of the complaint were proved, and the plaintiff testified that he was not acquainted with either Mr. or Mrs. Knowlden. These facts were not controverted. It was shown that under a statute of New Jersey the commission of adultery was a crime punishable by fine or imprisonment. There was no evidence tending to show, nor did the defendant claim, that the facts published concerning plaintiff's misconduct with Mrs. Knowlden were true. It appears that a bill of complaint for a divorce was filed by Knowlden in the clerk's office of the Court of Chancery at Trenton, N. J., either on the 21st or 22d day of August, 1900; but it was not shown that any summons, subpoena, or other process was issued thereon, or what directions, if any, had been given concerning the same, by the solicitor for the plaintiff therein, prior to the publication of these articles. Knowlden's divorce petition, which is signed by his solicitor, but not by him, charged that on the 20th day of August, 1900, between 7 and 9 o'clock in the evening, his wife committed adultery with the plaintiff in this action in a field at the extreme end of Mead avenue, in the city of Passaic; but it did not otherwise state the circumstances or any of the facts contained in the articles published, nor were the criminating facts charged in the petition verified by affidavit or otherwise. The affidavits referred to in the alleged libelous articles were made before a justice of the peace at the instigation of Knowlden, and were delivered to his attorney, but were not filed, and did not accompany the divorce petition, as stated in the newspaper articles, nor were they referred to therein; nor did they or the divorce petition charge, as stated in the newspaper articles, that the plaintiff had given Mrs. Knowlden diamonds or clothes. It appeared that the information upon which these articles were published was not, nor could but little of it be, obtained from an inspection of the divorce petition, or from the clerk of the court, and that neither the writer of the articles, nor any one connected with the defendant, ever saw the divorce petition or the affidavits. A correspondent of the World who resided in Passaic, and whose compensation depended on the acceptance and use of the news transmitted, wrote the first article; and, according to his testimony, it was written and forwarded the day before the divorce petition was filed—but, if so, its publication must have been withheld for a short time

—and was based upon street rumors and information derived from the attorney for Knowlden and from another party, who, at the correspondent's instigation, called on the attorney for Knowlden, and was informed as to the contents of the divorce petition and affidavits; the attorneys having refused to disclose the facts to the correspondent of the World. He also wrote all the articles except the last, which was written by a regular reporter, specially detailed for that purpose.

At the request of counsel for the defendant, the court instructed the jury, separately, first that the divorce proceeding in the Court of Chancery "was a judicial proceeding, and the defendant had the absolute right to publish a full and fair report of the same, and even to make comments thereon"; second, "that, in so far as the publication in question and the comments made are substantially correct reports of said judicial proceeding, this defendant is entitled to a verdict"; third, that the defendant "had a perfect right to publish facts of the commencement" of the divorce action, and that the petition contained a statement that the plaintiff in this action had committed adultery with Mrs. Knowlden; and, fourth, that, if these publications constituted a full and fair report of what was contained in the divorce petition, then the plaintiff could not recover. Counsel for the plaintiff excepted to each of these instructions, and to the refusal of the court to charge at his request that the publication of the contents of the divorce petition was not privileged, as a report of a judicial proceeding.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

John M. Bowers, for appellant.
George Ryall, for respondent.

LAUGHLIN, J. The important questions requiring consideration on this appeal will be discussed separately:

1. The order expressly shows that the trial justice granted a new trial in the exercise of his discretion, as well as upon the exceptions, and because the verdict was deemed inadequate. It does not and cannot appear, therefore, that the motion was granted solely upon exceptions or errors of law, or a misunderstanding of the effect of the evidence; and, according to precedents in this court, the order should be affirmed. Connor v. The Mayor, 28 App. Div. 186, 50 N. Y. Supp. 972; Ludeman v. Third Ave. R. Co., 30 App. Div. 522, 52 N. Y. Supp. 310; Mooney v. Press Pub. Co., 58 App. Div. 613, 68 N. Y. Supp. 739. Moreover, owing to the long colloquy between counsel and the court during the summing up, the learned trial judge may have realized, better than we can from reading the record, that the jury did not understand the propositions of law intended to be laid down for their guidance on the question of damages. Owing to the fact that the court made inquiries of the counsel during the summing up, which invited counsel to interrupt the court at other times, and to the fact that documents and series of requests to charge were read, discussed, modified, and charged, it is extremely doubtful whether the jury fully comprehended their duty in the premises. There was therefore sufficient ground to warrant the court in exercising its discretion favorably to the plaintiff by awarding a new trial.

2. There is no difference in principle between reducing a verdict for excessive damages and setting aside a verdict because the damages are inadequate. McDonald v. Walter, 40 N. Y. 551; Morrissey v. Westchester Elec. Light Co., 30 App. Div. 424, 51 N. Y. Supp. 945;

Cowles v. Watson, 14 Hun, 41. Section 999 of the Code of Civil Procedure expressly authorizes the trial court, where, as here, a motion was made for that purpose upon the minutes, to set aside the verdict upon the ground that the damages are inadequate. Some of the decisions seem to intimate, if not hold, that the authority of the court to set aside a verdict on the ground that the damages are excessive is greater than its authority to vacate the verdict for inadequacy of damages; but it will be found that they are based upon the provisions of section 264 of the Code of Procedure, which, unlike section 999, Code Civ. Proc., contained no express authority to set aside a verdict for insufficiency of damages. In this case I think the evidence indicates that the plaintiff sustained substantial damages, and the verdict for six cents is against the weight of the evidence, and was properly set aside. These articles were libelous per se, and, beyond question, much that was printed of a libelous nature was not privileged. As the case stood before the jury, these extremely damaging charges were all false, and the plaintiff was entirely innocent. There seems to have been no ground at all for making a charge against him. They appear to have resulted from a jealous husband employing irresponsible detectives, who had no regard for truth or veracity, or for the character and reputation of citizens. The defendant understood that the plaintiff denied the charges, and, if it had interviewed him, it might have been convinced of their falsity. Without doing so, it published them at its peril. It may well be that the plaintiff exaggerated the effect of these publications upon him mentally, but that is no justification for his not receiving a verdict in an amount which will vindicate his character. He was entitled to compensatory damages, at least; and it is unreasonable, I think, to contend that a jury of fair, intelligent citizens would value a good reputation so lightly as to believe it is not injured by a publication of such charges. There is nothing in the testimony of the plaintiff or in this record to explain the amount of the verdict, except on the theory that the jury became confused on the rule of damages, as well they may have, owing to the manner in which that question was submitted to them.

3. Assuming that the publication of the filing and contents of the divorce petition would be privileged, as a report of a judicial proceeding, I think that, as matter of law, the whole of this publication was not privileged, for the reason that the privilege is limited to "a fair and true report" of the judicial proceeding (Code Civ. Proc. §§ 1907, 1908; Hart v. Sun Printing & Pub. Ass'n, 79 Hun, 358, 29 N. Y. Supp. 434; Bissell v. Press Pub. Co., 62 Hun, 551, 17 N. Y. Supp. 393; Moore v. M. N. Bank et al., 123 N. Y. 424, 25 N. E. 1048, 11 L. R. A. 753; Sanford v. Bennett, 24 N. Y. 20; Salisbury v. Union & Advertiser Co., 45 Hun, 120; Cooley on Con. Lim. [6th Ed.] 550, and note); and this publication was not confined to a fair and true report of the filing and contents of the divorce petition, and it was error for the court to permit the jury to find that it was. Of course, where the article is privileged, the court should apply a liberal construction in determining what part is and what part is not privileged (Moore v. M. N. Bank et al., supra; Youmans v. Smith, 153 N. Y. 214, 47 N. E. 265), but even that rule will not avail in this case. The facts were not

detailed in the petition, and it contained no reference to the affidavits. If the publications had been confined to the contents of the petition, they would not have been so serious. People would then understand that it was merely an unverified charge made by a husband against his wife, designating the plaintiff as the co-respondent—an assertion, perhaps, as it now appears, wholly on suspicion. The publications, however, conveyed the impression that the charge was true, in that it was supported by the affidavits of eyewitnesses, and reaffirmed by the husband and his attorney after due deliberation. The facts which the law permits to be published under the protection of this privilege are those which appear on the judicial proceeding itself. The greater part of these articles—the sensational and most damaging part—consists of gossip, alleged to have been vouched for by the attorney for Knowlden, concerning conduct of, and the relations between, the plaintiff and Mrs. Knowlden, and his giving her presents, none of which was set forth in the divorce petition; and the publication of these statements was not privileged, even though the contents and filing of the petition for a divorce were. Cases supra; Storey v. Wallace, 60 Ill. 51; McDermott v. Evening Journal, 43 N. J. Law, 488, 39 Am. Rep. 606; Ludwig v. Cramer, 53 Wis. 193, 10 N. W. 81. Hence it conclusively appears that the whole of the article was not an account of a judicial proceeding, and therefore the whole was not privileged.

4. The articles being libelous per se, privilege is a defense to be pleaded and proved, and upon the defendant rested the burden of showing that the publication was privileged. Kimber v. The Press Ass'n, L. R. (1893) 1 Q. B. 65; Moore v. M. N. Bank et al., supra; Beiser v. Scripps-McRae Pub. Co. (Ky.) 68 S. W. 457–459. The plaintiff in the divorce action was undoubtedly privileged in making the charges against Stuart, under a rule of public policy which requires that litigants and their counsel shall be privileged in stating the facts material and relevant or pertinent to any action or proceeding in court. Marsh v. Ellsworth, 50 N. Y. 309; Moore v. M. N. Bank et al., supra; Youmans v. Smith, supra; Jones v. Brownlee (Mo.) 61 S. W. 795, 53 L. R. A. 445; Townshend on Libel & Slander (4th Ed.) § 221. Before the enactment of chapter 130, p. 314, of the Laws of 1854, it was the rule in this state, following what was then supposed to be the common-law rule in England, that the privilege under the common law of publishing judicial proceedings only extended to contested proceedings in open court, and not to preliminary ex parte proceedings. Stanley v. Webb, 4 Sandf. 21; Ackerman v. Jones, 37 N. Y. Super. Ct. 42. The statutory privilege does not extend to headlines (Code Civ. Proc. § 1908), which are no part of the report of a judicial proceeding, but merely comments thereon, and they are only privileged if they are a fair index of a truthful report. Lawyers' Co-op. Pub. Co. v. West Pub. Co., 32 App. Div. 585, 52 N. Y. Supp. 1120; Hart v. Sun Printing & Pub. Ass'n, supra. But the rule is now well settled, under the statute last cited, and section 1907 of the Code of Civil Procedure, which is a re-enactment thereof without material change (see note to Throop's Code), in accordance with what has since been declared to be the common law of England, that the privilege extends to all public judicial proceedings, and applications to magistrates, judges, or courts

for judicial action, ex parte or on notice. Ackerman v. Jones, supra; Salisbury v. Union & Advertiser Co., supra; Bissell v. Press Pub. Co., supra; Usill v. Halles, 5 C. P. Div. 319, 324, 329; Metcalf v. Times Pub. Co. (R. I.) 40 Atl. 864, 78 Am. St. Rep. 900; Odgers on Libel & Slander (3d Ed.) 279; Townshend on Libel (4th Ed.) 361 et seq. This privilege is founded upon grounds of public policy, for the purpose of securing and insuring the integrity of the bench, and preserving public confidence in those administering justice, which it was thought might be jeopardized by secret proceedings or hearings; and it would seem to follow logically that the privilege does not attach until an application is made to a magistrate, judge, or court for some judicial action, and this is the rule established by the authorities. Newell on Slander & Libel (2d Ed.) § 55; Cowley v. Pulsifer, 137 Mass. 392, 50 Am. Rep. 318; Barber v. St. Louis Dispatch Co., 3 Mo. App. 377; Usill v. Halles, supra; Metcalf v. Times Pub. Co., supra; Kimber v. Press Ass'n, supra; Sutton v. A. H. Belo & Co. (Tex. Civ. App.) 64 S. W. 686; 18 Am. & Eng. Enc. of Law (2d Ed.) 1044; Park v. Detroit Free Press Co., 72 Mich. 560, 568, 40 N. W. 731, 1 L. R. A. 599, 16 Am. St. Rep. 544; Cincinnati Gazette Co. v. Timberlake, 10 Ohio St. 548, 78 Am. Dec. 285. See, also, Sanford v. Bennett, supra, and Billet v. Times-Democrat Pub. Co. (La.) 32 South. 17, 58 L. R. A. 62.

Without unduly lengthening this opinion by a discussion of the authorities, or quotations from them, it may be stated that the reason for this limitation is that the public are not concerned in the preliminary proceedings formulating claims, causes of action, charges, or defenses, for presentation for judicial action; that the public are not concerned in the private controversies between citizens, but only in the action of the judicial officers or tribunals thereon; and that until the judicial action is invoked the proceeding or action may be abandoned or discontinued by the parties without ever bringing the same to the attention of a magistrate, judge, or judicial tribunal. If Knowlden had been overheard to charge his wife with improper relations with Stuart, of course, no person repeating or publishing the charge could assert a claim of privilege. When such charge is made in a complaint which may never be served or brought to the attention of the court for an adjudication, and may be withdrawn at will, is its publication by the press to be deemed privileged, and the publisher relieved of actual damages to an innocent party injured or ruined by the publication of a groundless defamatory charge? Clearly, such publication would not be privileged under the common law, which gave no greater rights in this regard to the press than to an individual. Cooley on Con. Lim. (6th Ed.) 556; 18 Am. & Eng. Enc. of Law (2d Ed.) 1051; Park v. Detroit Free Press Co., supra. Assuming, without deciding, that the statutory and Code provisions cited were designed to confer upon reporters, editors, and proprietors of newspapers greater privileges in this regard than are enjoyed by others, and that such legislation is valid, still, since these provisions of statutory law take away causes of action that existed at common law, they cannot be extended by construction. Such a privilege, depending upon the statute, which is in

derogation of the common law, must be fairly within the letter of the law, or warrant therefor does not exist.

Liberty of speech and of the press is guarantied by the supreme law of the land, and will be zealously guarded, preserved, and enforced by the courts. The provisions of the federal and state Constitutions (first amendment; and section 8, art. 1, of the state Constitution) were designed to secure rights of the people and of the press for the public good, and they do not license the utterance of false, slanderous, or libelous matter. Individuals are free to talk, and the press is at liberty to publish, and neither may be restrained by injunction; but they are answerable for the abuse of this privilege, in an action for slander or libel, under the common law, except where by that law, or by statute enacted in the interest of public policy, the publication is privileged and deemed for the general good, even though it works a private injury.

The publication having been made in this state, undoubtedly the defendant is entitled to the benefit of any privilege extended by the common law or by our statutes; but, as has been seen, the only privilege at common law at all applicable is that accorded to the publication of "a fair and true" report of a public judicial proceeding; and the statutory privilege conferred by section 1907 of the Code, so far as it relates to judicial proceedings, likewise confines the privilege to judicial proceedings which are both public and official. Sanford v. Bennett, supra; Salisbury v. Union & Advertiser Co., supra; Falkard's Law of Slander & Libel (5th Ed.) 222; McCabe v. Cauldwell, 18 Abb. Prac. 377. No statute of New Jersey regulating proceedings in divorce actions, or declaring the rights of the public to an inspection of the records therein, has been proved. We must therefore assume that the common law prevails. At common law the pleadings or papers filed in an action or proceeding were not open to public inspection—especially should this be so in actions for divorce—but only to the inspection of those having an interest therein or right of access thereto; and this was not permitted for the purpose of publication, or to gratify private spite or promote public scandal. The King v. The Mayor of Maidstone, 6 Dowl. & R. 334; In re Caswell's Request, 18 R. I. 835, 29 Atl. 259, 27 L. R. A. 82, 49 Am. St. Rep. 814; Schmedding v. May, 85 Mich. 1, 5, 6, 48 N. W. 201, 24 Am. St. Rep. 74; Burton v. Reynolds, 110 Mich. 354, 68 N. W. 217; In re McLean, Fed. Cas. No. 8,877, 2 Flip. 512; Daly v. Dimock, 55 Conn. 579, 12 Atl. 405; Buck v. Collins, 51 Ga. 391, 21 Am. Rep. 236; Cormack v. Wolcott, 37 Kan. 391, 15 Pac. 245; State v. Rachac, 37 Minn. 372, 35 N. W. 7; Belt v. Prince George's Co. Abstract Co., 73 Md. 291, 20 Atl. 982, 10 L. R. A. 212. The cases cited and many others show the distinction between the proceedings in open court before a magistrate, judge, or judicial tribunal, and the papers in the action or proceeding, which merely concern the parties directly interested, except so far as the validity of a judgment or other decree or process affecting property rights, in which third parties may be interested, may depend thereon.

Whether the privilege extends to the publication of pleadings merely filed or served in this state, where no action can be taken

thereon by the court without an application by one or both of the parties, may not be free from doubt, and need not be decided. Truth is always a complete defense, and statements which are true may be freely published. But the privilege which affords immunity against falsity of the matter published being limited to reports of judicial proceedings, has a newspaper a license to publish the contents of a complaint or answer prepared, served, or filed before judicial action has been in any manner invoked, when the parties or their attorneys or any individual would not have such right? See Park v. Free Press Co., 72 Mich. 560, 569, 40 N. W. 731, 1 L. R. A. 599, 16 Am. St. Rep. 544; Cooley on Con. Lim. (6th Ed.) p. 550, and note; Metcalf v. Times Pub. Co. (R. I.) 40 Atl. 864, 78 Am. St. Rep. 900; Schmedding v. May, supra.

In Schmedding v. May, supra, where a reporter was refused access to papers filed in an action, the court say:

"If the object be to obtain and publish the charges set forth in a bill for divorce, certainly the public are not interested, and their interests would undoubtedly be well subserved if the contents thereof were never published. These suits, involving private transactions, may never come to trial or hearing. The troubles may be settled, and the charges withdrawn. In such cases there can be no objection to the papers remaining under the control of the court and the parties until such time as they choose to make them public by proceedings in open court or otherwise."

In Park v. Free Press Co., supra, the court say:

"There is no rule of law which permits anybody but the parties interested to handle the files, or publish the contents of their matters in litigation. The parties, and none but the parties, control them. One of the reasons why parties are privileged from suit for accusations made in their pleadings is that the pleadings are addressed to courts, where the facts can be fairly tried, and to no other readers. If pleadings and other documents can be published to the world by any one who gets access to them, no more effectual way of doing malicious mischief with impunity could be devised than filing papers containing false and scurrilous charges, and getting those printed as news. The public have no right to any information on private suits till they come up for public hearing or action in open court; and, when any publication is made involving such matters, they possess no privilege, and the publication must rest on either nonlibelous character or truth to defend it."

In Metcalf v. Times Pub. Co., supra, the court, considering this question, say:

"The rule as thus stated seems now to be settled as the law both in England and in this country, and it makes a clear line of distinction between publications which are lawful and those which are not. It gives no license to publish libelous matter simply because it is found in the files of a court. As a publisher of news and items of public importance the press should have the freest scope, but as a scandal monger it should be held to the most rigid limitation. If a man has not the right to go around to tell of charges made by one against another, much less should a newspaper have the right to spread it broadcast and in enduring form. It is necessary to the ends of justice that a party should be allowed to make his charges against another, for adjudication, even though they may be of a libelous character, and as such they are privileged; the injured party having a remedy when they are made maliciously or without probable cause. But the right of a party to make charges gives no right to others to spread them."

Legislation was deemed necessary in this state to extend the privilege to ex parte judicial proceedings, it being then supposed that the

publication of such proceedings was not privileged at common law. Beyond a doubt, the Legislature has determined that the public are entitled to know what applications are made to our judges, magistrates, and courts for judicial action, the proceedings thereon, and how the same are decided; but has it declared that parties to a litigation, their attorneys, or others, may repeat the charges made in pleadings, or procure their publication to the world, through the medium of a newspaper, in advance of any application for judicial action, and at a time when the proceedings are under the control of the parties, and may be withdrawn or discontinued, and, no matter how false the charges may be, if published without malice, secure immunity on the ground that the privilege which applied to the party in stating the charges in the pleading, or which would apply when the matter is presented for judicial action, extends to such publication? Or is it not, rather, the rule that until the proceedings are brought to the attention of the court, judge, or magistrate, or have so far advanced that the parties have lost absolute control over them, and they must come up for judicial action, there is no privilege, either at common law or under our statute as it now exists, and it must be held that the dissemination of charges contained in the pleadings, which then concern only the parties to the litigation, through the medium of the press, is not privileged? May any one repeat or publish such charges with impunity, regardless of their being true or false, and furnish a copy of a complaint in divorce, reflecting on the character of an innocent man or woman, to the press, for publication, and may it be published and commented on as privileged, regardless of its truth or falsity, merely because the complaint has been framed, served, or filed, even though the action has not been noticed for trial or placed on a calendar, and no application has been made therein to the court, and may never be, for preliminary, provisional, or other relief, and the suit may be compromised without the intervention of the court? See Cowley v. Pulsifer and Sanford v. Bennett, supra. These are grave questions, not free from doubt, and they should not be decided until necessarily presented. Although the charge of the court that the publication of the filing and contents of the divorce petition was privileged, as a judicial proceeding, was excepted to, yet the New Jersey statutes under which the petition was filed, and regulating the practice thereon, were not introduced in evidence, and we cannot take judicial notice of them. In form, the petition is addressed to the court. Perhaps the filing of it constitutes an application to the court, and that thereupon a subpœna, summons, or other writ is, either in fact or in theory, issued by the court; and, if so, the mere filing may constitute a judicial proceeding. Therefore the question should not and cannot be authoritatively determined on this appeal.

It follows, however, for reasons already assigned, that the order should be affirmed, with costs.

PATTERSON and HATCH, JJ., concur.   VAN BRUNT, P. J., dissents.

INGRAHAM, J. (concurring). The trial court charged the jury that the articles published were libelous per se, and that "if the de-

fendant published of and concerning the plaintiff a false and libelous charge, and has not shown with respect to that that he was privileged, why, the plaintiff is entitled to recover such an amount as will compensate him for the actual damage shown, within the rule I have stated to you before"; that the plaintiff was bound to receive something; that the jury were simply to determine how much the plaintiff should have, "with respect to any libel published of him, beyond what was contained in a full and fair report of what was contained in the publication which I read to you." The jury found a verdict for the plaintiff in the sum of six cents, whereupon the court set aside the verdict "on the ground that it is inadequate, upon the exceptions, and as matter of discretion." In view of this instruction, the jury having found for the plaintiff and fixed the amount of damage, the exceptions in the case which relate to other subjects than the amount to which the plaintiff was entitled would not justify the court in setting aside the verdict; but in view of the method in which this case was submitted to the jury, and the fact that the learned trial judge, who had heard the evidence, considered that the ends of justice required that there should be a new trial, I do not think that this court should reverse the order granted in the exercise of this discretion.

To this extent only I concur in the prevailing opinion.