WILLIS R. COATS, Appellant, v. THE NEWS CORPORATION, a Corporation. —No. 39709.—197 S. W. (2d) 958.

Division One, December 9, 1946.

*Roy W. Rucker* and *Robert B. Sympson* for appellant.

*Culver, Phillip, Kaufmann & Smith* for respondent.

HYDE, P. J.—This is an action for libel. Plaintiff sued for $50,000.00 actual and $50,000.00 punitive damages. He had a verdict for one dollar compensatory damages and one dollar punitive damages. He filed a motion for new trial on the sole ground of inadequacy of the verdict. This was overruled and plaintiff has appealed from the final judgment entered.

On November 29, 1940, Charles C. Coates, who had just been sentenced to life imprisonment, escaped with other convicts from the Buchanan County jail. Defendant, publisher of morning and evening newspapers, published articles about this jail break, in which Charles C. Coates was the leader, in both papers on November 30th, and several times during December had further articles about the escaped prisoners. Some of the prisoners were soon recaptured but Charles C. Coates was at large until December 26th. He killed a Georgia highway patrolman who stopped him near Ringgold, Georgia and was hunted in the vicinity by officers of Georgia and Tennessee for five days. He was finally captured near Decatur, Tennessee. During this period of almost a month, both of defendant's papers published many articles about Charles C. Coates, his previous criminal career, his escape and capture. His picture appeared in connection with some of these articles and it was stated that he was "the son of Dr. C. C. Coates, a former St. Joseph physician, who now resides at Silver City, N. M."

On December 27th, defendant's morning paper published a picture of Charles C. Coates, in the custody of the Georgia officers, above an article the first part of which was as follows:

"Charles C. Coates, the twenty-eight-year-old St. Joseph jailbreaker, found yesterday that a career in small-time banditry could lead a man to within the shadows of the death house. He was in jail at Atlanta, charged with murder.

"Being in jail was nothing new to Coates, and probably not very disturbing to him, but being charged with the murder of a Georgia highway patrol corporal was a serious climax to the crime career *of a former ticket agent for the old interurban company*. This new charge, filed after Coates had admitted killing Corp. W. F. Black at Ringgold, Ga., last Friday night while he was fleeing after his escape from jail here the night of Nov. 29, looked like the end of his career of crime—and probably his life.

"*Back in the days when Coates sold tickets at the old interurban depot at Eighth and Charles streets, he was a pleasant, good looking and affable young fellow.* His father was a doctor here. His wasn't the picture of a budding young criminal.

"But in Atlanta yesterday he told authorities 'I had things too easy as a youth—I stole food, but there wasn't any need to because I was well off and wasn't hungry.'

"*Coates left the interurban company under a shadow because of his handling of funds,* and then began his series of more serious

crimes, mostly drug store robberies. At first he was just a 'punk', as police call young bandits who are not really tough but soon officers began to regard him as a dangerous character." (Our italics.)

Charles C. Coates had never been employed by the interurban company (Kansas City, Clay County and St. Joseph Railway) but plaintiff, Willis R. Coates, had sold tickets at the company's St. Joseph Station during the last five years of its operations. (1927-1932.) He was known as "Coats" and "Coatsey," to some of its patrons who did not know his first name. There is no evidence that any other man named Coats or Coates ever sold tickets for the interurban in St. Joseph. Plaintiff was told about the article on the morning of its publication. His employer arranged a meeting with defendant's publisher at which the city editor was also present. They said that they had made a mistake; that they were sorry; and that they wanted to correct it. They immediately prepared an article for their evening paper which was published on the front page, with large headlines.

This article was submitted to plaintiff and his employer for their approval and was repeated in substance in the morning paper. It was as follows:

"Charles C. Coates, held at Atlanta for the murder of a Georgia state highway patrol officer, never was employed in the former St. Joseph-Kansas City interurban office as was stated in a story in this morning's Gazette.

"Apparently Coates, who escaped from the Buchanan County jail Nov. 29 after receiving a life sentence for robbery was confused with Willis R. Coats, who was employed in the ticket office of the interurban station some years ago.

"Willis R. Coats is a representative here of John J. Meier & Co. and has never been in trouble.

"It is not the first time that Charles C. Coates and Willis R. Coats have been confused. They were raised within a block of each other on Olive street and attended the same grade school and the same Sunday school. While Charles C. Coates has been constantly in trouble with the law since his grade school days, Willis R. Coats has at all times had an excellent reputation."

Plaintiff's picture was also published on the front page of the morning paper under the headline "Has Clear Record" and with the following explanation:

"Willis R. Coats (above), a former employe in the old Kansas City-St. Joseph interurban office, worked there several years and left the company with a clear record. It was stated in The Gazette yesterday morning that Charles C. Coates, who broke jail here Nov. 29 and now is held in Atlanta for murder, had worked for the interurban company. Charles C. Coates never worked for the company, and Willis R. Coats, the man who did, has never been in trouble."

Plaintiff was a traveling salesman. He said that people in his territory mentioned the article of December 27th to him and "kidded" him about it. He said that he worried about it and lost sleep. Several of his witnesses who knew him well (including his employer) testified that when they read it they knew he was not the bandit described in this and previous articles. Others who knew only his last name, and that he had sold tickets for the interurban, thought it referred to him at first but either saw the explanation published in the paper or found out by inquiry that he was not the bandit. Each of them said that his good opinion of plaintiff was not changed. His employment was in no way affected and he continued to work for the same company. In 1940, when the article was published, he was being paid $125.00 per month. He thereafter received several raises in pay and at the time of the trial in 1945 was being paid $360.00 per month. (This suit was commenced in 1942.) The reporter who wrote the article did not know plaintiff. He said that he got the information on which it was based either from the police or from the office of the sheriff or prosecuting attorney.

██ Defendant contends that it was entitled to a directed verdict. It says that the article is unambiguous and clearly identifies the person of whom it was written by his correct name, his photograph and his parentage; and that plaintiff is not entitled to recover merely because some readers may have thought the article applied to him. It further says that the reference to "a ticket agent of the interurban" would not be sufficient to identify plaintiff as the person intended because the company had other ticket sellers, citing Helmicks v. Stevlingson (Wis.), 250 N. W. 402. However, in that case the reference was merely to a former cashier of a bank (there having been several) with no name being stated. Likewise, in Kassowitz v. Sentinel Co. (Wis.), 277 N. W. 177, the reference was to part time doctors employed at a hospital (several being employed at the time) with no name being stated. In each of these cases it was held that the plaintiff (who was one of several who might be meant) had no cause of action because the article did not sufficiently identify him. [See also ██ Caruth v. Richeson, 96 Mo. 186, 9 S. W. 633.] Here the name Coates was stated, which would be pronounced the same way as plaintiff's name, and there is no contention that any other Coates or Coats ever sold tickets for the interurban.

The rule is thus stated in the American Law Institute Restatement of Torts, Section 564: "A defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands it as intended to refer."

The Restatement makes the following comment: "If the communication is reasonably understood by the person to whom it is made as intended to refer to the plaintiff, it is immaterial that the defamer did not intend to refer to him. It is not enough, however, that the

defamatory matter be actually understood as intended to refer to the plaintiff; such interpretation must be reasonable in the light of all the circumstances. It is not necessary that the plaintiff be designated by name; it is enough that there is such a description of or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended. . . . If the applicability of the defamatory matter to the plaintiff depends upon extrinsic circumstances, it must appear that some person who saw or read it was familiar with the circumstances and reasonably believed that it referred to the plaintiff.'' [See also Annotation 91 A. L. R. 1161 on Identification of person defamed; 33 Am. Jur. 101, Sec. 89; 36 C. J. 1160, Sec. 25; Conroy v. Breland (Miss.), 189 So. 814; Newsted v. London Express, 1 K. B. (1940) 377; Newell on Slander & Libel (4th Ed.) 257-267; Odgers on Libel & Slander (5th Ed.) 147-156; Farley v. Evening Chronicle Publishing Co., 113 Mo. App. 216, 87 S. W. 565; Gold v. S. Pian Time Payment Jewelry Co., 165 Mo. App. 154, 145 S. W. 1174.]

Thus the question for the court, in ruling on the request for a directed verdict in such a case is: could the article be capable of being reasonably understood to apply to plaintiff? If the court decides that it reasonably could be so understood, then the questions to be submitted to the jury are: would the article reasonably be interpreted, by some of those who read it, as referring to plaintiff?; and, did any so interpret it? We think that a person knowing only plaintiff's last name, and not knowing his present location, but knowing that he sold tickets at the interurban station designated in the article (especially in view of the description of the ticket agent which could fit plaintiff) could reasonably although mistakenly understand the article to mean that plaintiff was the bandit. We, therefore, hold that defendant was not entitled to a directed verdict.

Defendant, however, contends that in any event the jury was warranted in awarding only nominal damages. Plaintiff emphasizes the statement in the article ''that the person who had sold tickets for the interurban left under a shadow because of his handling of funds''; and says that this was harmful to plaintiff independently of the account of the bandit's acts. Plaintiff cites the following cases on the proposition that the verdict and judgment for nominal damages should be set aside as inadequate: Griebel v. Rochester Printing Co., 14 N. Y. S. 848, 60 Hun, 319; Stuart v. Press Publishing Co., 82 N. Y. S. 401, 83 App. Div. 467; Blackwell v. Landreth, 90 Va. 748, 19 S. E. 791. However, in none of these cases was the situation presented that we have here: a mistake which was frankly admitted and promptly corrected by publishing explanatory articles, with plaintiff's picture; and in which the apology was given more prominence and wide circulation than the original reference which could have applied to plaintiff. [For a case holding damages of One Dollar not

insufficient as a matter of law where an apology was promptly published see Pridemore v. San Angelo Standard (Tex.), 164 S. W. (2d) 859.] The Blackwell case (cited by plaintiff) was a very flagrant case of an intentionally malicious slander of a young woman, for the purpose of injuring defendant's opponent in a political campaign, which the court said entitled her to substantial damages. In the Griebel case, the verdict was for defendant and a new trial was ordered because of the trial court's error in instructing the jury that plaintiff would only be entitled to nominal damages if the article was published without any malicious intent. The court there also refused requests for instructions authorizing the jury to allow substantial damages even though the publication was made by mistake. (The court's instructions in this case did authorize the jury to find substantial damages.) In the Stuart case, the trial court granted plaintiff's motion for new trial after a verdict of six cents. This order was sustained on appeal as a proper exercise of the discretion of the trial judge. (The trial judge who heard the witnesses in this case overruled plaintiff's motion for new trial.) Moreover, in the Stuart case the defendant published the article making false charges against the plaintiff after "defendant understood that the plaintiff had denied the charges"; and the court also thought that the jury may well have been confused on the rule of damages "owing to the manner in which that question was submitted to them."

In libel cases, as in other tort actions, "a verdict will be set aside as inadequate for the same reasons that will justify the setting aside of a verdict for excessive damages." [Newell on Slander & Libel, 910, Sec. 803; see also Odgers on Libel & Slander, 708] However, the verdict of the jury will not be set aside merely because of being greater or less than the court might deem proper, since "there is no fixed measure of damages applicable to actions for defamation." [37 C. J. 128, Sec. 590; 33 Am. Jur. 283-285, Secs. 299-300.] In such cases as in other personal actions not involving physical injuries, like assault and malicious prosecution, the courts approach these questions with great reluctance. [Brown v. George Knapp & Co., 213 Mo. 655, 112 S. W. 474; see also Prichard v. Hewitt, 91 Mo. 547, 4 S. W. 437; Gregory v. Chambers, 78 Mo. 294; Von Schoech v. Herald News Co. (Tex.), 237 S. W. 651.] As we said in the Brown case (213 Mo. 1. c 697): "The question of damages for a tort, especially in a case of libel or slander, is peculiarly within the province of the jury, and unless the damages are so unconscionable as to impress the court with its injustice and thereby to induce the court to believe that the jury were actuated by prejudice, partiality or corruption it rarely interferes with the verdict." [See also Perdue v. Montgomery Ward & Co., 341 Mo. 252, 107 S. W. (2d) 12; Henderson v. Cape Trading Co., 316 Mo. 384, 289 S. W. 332.] However, "this rule is not applicable to actions ex contractu, nor in those ex delicto, where the dam-

ages may be measured with some degree of certainty.'' [Edwards v. Missouri Pacific R. Co., 82 Mo. App. 478; Watson v. Harmon, 85 Mo. 443.] But in all cases, the questions of excessiveness or inadequacy are primarily addressed to the discretion of the trial court.

''When a trial court specifies as a ground for sustaining a motion for a new trial that the award of the jury is inadequate it is equivalent to saying that, in the mind of the trial judge, the verdict (amount of the award) is contrary to the weight of the evidence. Stegner v. Missouri-Kansas-Texas R. Co., 333 Mo. 1182, 64 S. W. (2d) 691; Herschel v. Orpheum Theatre Co. of Missouri, 330 Mo. 581, 48 S. W. (2d) 108; Hunt v. Gus Gillerman Iron & Metal Co., 327 Mo. 887, 39 S. W. (2d) 369; City of St. Louis v. Franklin et al., 324 Mo. 1212, 26 S. W. (2d) 954.'' [Murphy v. Kroeger Grocery & Baking Co., 350 Mo. 1186, 171 S. W. (2d) 610; O'Shea v. Pattison-McGrath Dental Supplies, 352 Mo. 855, 180 S. W. (2d) 19.] When the trial court grants a new trial on this ground, an appellate court will not interfere ''so long as there is any substantial evidence to bolster up the trial court's action''; but ''the moment the trial court has ruled adversely upon the motion for a new trial and has thus·put the seal of its approval upon the verdict of the jury, the point of view of the appellate court upon matters having reference to the weight of the evidence, changes diametrically and all presumptions are to be exercised in favor of the verdict and it must be upheld if there is any substantial evidence to uphold it.'' [State ex rel. Atchison, T. & S. F. R. Co. v. Ellison, 268 Mo. 225, 186 S. W. 1075.] In this case, the trial judge exercised his discretion by refusing to grant a new trial on the ground of inadequacy and we should uphold his action unless it conclusively appears that the plaintiff has actually suffered substantial damages.

We do not think it does so appear in this·case. The escape and record of Charles C. Coates had been given so much publicity, during the month prior to the publication of the article of December 27th, with his pictures, statements of his parentage, and other facts identifying him, that undoubtedly most of the people of the territory knew who was meant by that article. Those persons who knew plaintiff well immediately recognized that he could not have been the bandit. Of course, those who did not know that plaintiff had ever sold tickets for the interurban would not have applied the article to him. Only those who knew plaintiff as a former ticket agent, and did not know him well enough to know his first name or his whereabouts, could have so applied it. The only persons in this class, who testified as witnesses, said that they found out very soon that plaintiff was not the person meant by the article. The statement in the article about leaving the interurban under a shadow was applied to the bandit and not to plaintiff independently of such designation. The article had no effect on plaintiff's employment and his compen-

sation had more than doubled before the trial. The prompt admission of the mistake by defendant and the immediate action taken to correct it in the way that would give the correction more prominence and wider circulation than the original reference applicable to plaintiff showed the utmost good faith. Therefore, a finding that plaintiff suffered no actual harm to his reputation would not seem unreasonable. Plaintiff had evidence of mental anguish and physical suffering but the jury was not compelled to believe it. Plaintiff apparently accepted defendant's action as adequate at the time because he did not commence suit for almost two years. We cannot find that a verdict for nominal damages was unconscionable under the circumstances of this case.

Plaintiff further argues that by allowing punitive damages the jury found the libel was malicious. However, they were instructed that they could allow punitive damages if they found legal malice. [Defined as follows: "The jury are instructed that in law there are two kinds of malice—malice in fact, and malice in law. By malice in fact is meant actual spite and ill will toward a person; by malice in law is meant the intentional doing of a wrongful act without legal justification or excuse."] There was no evidence of actual malice in this case, and certainly the finding of One Dollar punitive damages shows that the jury found nothing more than legal malice. While it is not necessary to find actual malice to support an award of substantial punitive damages (Byrne v. News Corp., 195 Mo. App. 265 and cases cited, l. c. 277; Times Publishing Co. v. Carlisle, 94 Fed. 762, 36 C. C. A., Mo. 475); nevertheless such damages are not a matter of right in any case but rest in the discretion of the jury. [Nicholson v. Rogers, 129 Mo. 136, 31 S. W. 260; Carson v. Smith, 133 Mo. 606, 34 S. W. 855; State ex rel. Mann v. Trimble, 290 Mo. 661, 232 S. W. 100; Seested v. Post Printing & Publishing Co., 326 Mo. 559, 31 S. W (2d) 1045.] In the latter case (upholding a large award) we said (31 S. W. (2d) 1054): "The giving or withholding of punitive damages, as well as the amount thereof, lies wholly within the discretion of the jury."

The judgment is affirmed. All concur.