**Christopher KENNEDY, Plaintiff–Respondent/Cross–Appellant,**

v.

**Craig JASPER and Jan Jasper, Defendants–Appellants/Cross–Respondents.**

**Nos. 68529, 68743.**

Missouri Court of Appeals, Eastern District, Division Four.

Sept. 3, 1996.

Lawrence F. Hartein, St. Louis, for Defendants–Appellants.

David C. Drury, St. Louis, for Plaintiff–Respondent.

KAROHL, Judge.

Craig and Jan Jasper, defendants, appeal from judgment for Christopher Kennedy, plaintiff, on his defamation action. Kennedy sued the Jaspers requesting injunctive relief and actual and punitive damages. The case was court-tried because of the equitable issues. At the opening of the trial, the court entered a consent order granting injunctive relief. At the conclusion of the evidence, the court found the Jaspers had published untruthful charges of misconduct by Kennedy. It found the Jaspers liable for actual damages of $30,000. Thereafter, the court considered additional evidence and awarded Kennedy punitive damages in the amount of $25. On appeal the Jaspers now argue there is no substantial evidence to support the award of actual damages. Kennedy filed a cross-appeal requesting a new trial regarding the amount of punitive damages. We affirm.

 We review the judgment in a court-tried case "upon both the law and the evidence as in suits of an equitable nature," giving "[d]ue regard ... to the opportunity of the trial court to have judged the credibility of witnesses." Rule 73.01(c)(1) and (2). We will affirm the judgment of the trial court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We may set aside a decree or judgment on the ground that it is "against the weight of the evidence" only with caution and with a firm belief that the decree or judgment is wrong. *Id.* Conflicts in evidence are for the trial court to resolve, and the facts must be taken in accordance with the result reached by the trial court. *Trenton Trust Company v. Western Surety Company*, 599 S.W.2d 481, 483 (Mo. banc 1980). The trial court, when sitting as the trier of fact, may believe all, part or none of the testimony of any witness. *Id.* Accordingly, the statement of facts which follows treats the evidence in a light most favorable to the judgment of the trial court and defers to the judgment of the trial court on matters in which the evidence is in conflict. *Id.*

There was evidence to support a finding the Jaspers defamed Kennedy. Liability is not contested. On November 22, 1991, Christopher Kennedy, then seventeen years old, babysat five-year-old J.J., son of Craig and Jan Jasper. The Kennedy and Jasper families were close friends, and Kennedy had frequently babysat for J.J. since the child's birth. On the night in question, Craig Jasper gave Kennedy two tickets to the soccer game at the Arena. Kennedy took J.J. to the game, accompanied by two of Kennedy's friends, Michelle Pretz and Mike Curls.

Craig Jasper testified that when J.J. arrived home after the game, he was quiet and would not talk to his father. J.J. told his father over the next two days that Kennedy: (1) took him to watch the game from private

box seats near the top of the Arena and while there, attempted inappropriate sexual contact; (2) kissed him on his face in the truck on the way to the soccer game; and (3) threatened to lock him up in a little concrete room in front of the Arena if he told anyone about the incident.

Kennedy testified these accusations were false and that nothing unusual happened at the Arena. He and J.J. sat with Michelle and Mike during the game. There were people seated all around them, including Michelle's aunt, a few rows behind them. Kennedy left the game only once to take J.J. to the restroom, where he waited for the child outside the stall. The boys bought a hot dog and soda at the concession stand before returning to their seats.

Craig Jasper reacted to J.J.'s story by speaking with Kennedy's parents to try to resolve the matter. He took J.J. to a therapist. He filed reports with the police department, a prosecutor, and the Division of Family Services. He was "very satisfied" with the investigations by the police and the Division of Family Services. Following the two investigations, no charges were filed against Kennedy. No one ever discovered any support for the alleged acts of abuse. He never talked about the incident with Michelle or Mike.

At trial the Jaspers did not offer testimony of J.J., his therapist, or any other expert witness. There was testimony that J.J. had told different and inconsistent stories about the "events." Jan Jasper was present at the trial but did not testify.

In March 1992, four months after the soccer game, Craig Jasper prepared, printed and distributed forty to fifty copies of the following statement:

* * * * * ATTENTION * * * * *
ATTENTION * * * * *
ATTENTION * * * * *

To ALL residents in Bellefontaine Neighbors:

* * * B E W A R E * * *

There is a SEX OFFENDER in your neighborhood. His name is CHRISTOPHER KENNEDY. His address is 10160 Cabot. He is seventeen years old, six feet, seven inches tall, with blonde hair and blue eyes. He presently attends Riverview Gardens Senior High, and he is employed at the K–Mart on Lewis & Clark Blvd. He sexually molested a 5–year–old boy while babysitting the child on the evening of November 22, 1991. (This case is currently under investigation.)

As a concerned citizen and parent, I feel it is my duty to let other residents and parents know that this SEX OFFENDER currently resides in your neighborhood.

* * * B E W A R E * * *

Craig Jasper admitted that on two occasions over a two-week period in March 1992, he and his wife placed approximately twenty of these notices on the windshields of cars in the parking lot at the Suburban Lanes Bowling Alley where Kennedy's father bowled in a league. They placed notices in the men's and women's restrooms and handed at least one notice to a bowling alley patron. Jan Jasper testified during her deposition they intended that "numerous persons would read [the notice]." They selected two Thursday nights because Mr. Kennedy would be at the bowling alley on those evenings. Craig Jasper "just wanted to let everybody know what Christopher Kennedy did ... [s]o it wouldn't happen again." He tried to make the notice specific, including Kennedy's name, address, age and physical description so that people would know who Kennedy was, what he did and "[s]o that it would never happen to their children." He admitted he took this action

because he was "aggravated" nothing had been done as a result of the police and agency investigations. He also admitted he initially lied to police and to Kennedy's counsel regarding his responsibility for printing and distributing the notice.

A number of people saw and read the notice, including Kennedy and trial witnesses Ron Linn, manager of the bowling alley; Gregory Stygar, a bowling alley patron who notified the police about the leaflets on vehicle windshields; and police officer John Ruckert, who spoke with the Kennedys and the Jaspers at the time of the distribution of the notices. There was testimony that others saw or heard about the notice and knew of its contents, including Kennedy's parents; Kennedy's psychiatrist, Dr. Rea Beck; Fran Pretz, the grandmother of Kennedy's infant son; Bellefontaine Neighbors Police Chief Serra; a female bartender at the bowling alley; a woman at Kennedy's place of employment; and at least two students at Kennedy's high school, one of whom called him "Chester Molester."

Prior to the publications, Kennedy was a good student and had a part-time job, good friends and good family relationships. After the publication of the accusations, Kennedy and his family were very upset and angry. After a detective interviewed him and his friends, Kennedy worried about what people thought about him and whether people at school were talking about him. Kennedy experienced increasing stress about his reputation and the broken friendship between his family and the Jaspers. There was testimony the Jaspers drove by the Kennedy house, appeared at Kennedy's place of work, and followed and stared at him on a number of occasions. Craig Jasper admitted placing fireworks on the Kennedys' front porch on New Year's Eve, 1991.

In February 1993, Kennedy attempted suicide, resulting in hospitalization and missed work. He testified ". . . the main reason [for the suicide attempt] was the case with the Jaspers and the letter that was put out and what people would think." He feared he would carry this stigma the rest of his life. Kennedy testified he was concerned his baby would always be negatively affected by the charges.

Dr. Beck confirmed to a reasonable medical certainty that publication of the accusations caused Kennedy great stress. She testified Kennedy's problems would continue into the future, he would "always have this scar," and he would not have attempted suicide had the Jaspers not published the notice.

Kennedy testified he continued to feel sad and upset at the time of the trial. He believed publication of the notice had damaged his reputation and would jeopardize any future prospects of obtaining employment working with children. He no longer receives requests to babysit neighborhood children.

As a result of the allegations, Michelle, the mother of his one-year-old son, no longer allows him to see his baby. Fran Pretz, Michelle's mother, testified that after hearing about the accusations, she asked her daughter not to let Kennedy see his child. She testified she would not want "somebody like that" to marry her daughter.

In the Jaspers' first and second points, they argue there was no substantial evidence Kennedy's reputation was damaged as a result of other persons reading the defamatory notice, and therefore, there was no proof to support an award of actual damages. Further, they argue there was no substantial evidence Kennedy's alleged damages were a result of the publication of the statement.

At common law, causes of action for libel and slander developed to protect an individual against harm to his or her reputation. *Henry v. Halliburton,* 690 S.W.2d 775, 779 (Mo. banc 1985). In the law of defamation, it is fundamental that one is liable for publication of false and defamatory matter which injures the reputation of another. *Laun v. Union Electric Co. of Missouri,* 350 Mo. 572, 166 S.W.2d 1065, 1070 (1942), (*citing* 3 Restatement, Torts, Secs. 558, 559, 577). We now consider libel and slander under the single tort of defamation, while retaining many of the common law characteristics of both. *Henry,* 690 S.W.2d at 779. "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or deal-

ing with him." *Id.,* (*citing* Restatement (Second) of Torts § 559).

In defamation cases we no longer apply the old rules of *per se* and *per quod. Duggan v. Pulitzer Publishing Co.,* 913 S.W.2d 807, 810 (Mo.App. E.D.1995) (*citing Nazeri v. Missouri Valley College,* 860 S.W.2d 303, 313 (Mo. banc 1993)). A plaintiff in a libel action, who is not a public figure, must plead and prove the elements set forth in MAI 23.06(1) [1980 New]. The plaintiff must prove: (1) defendant published the defamatory statement; (2) defendant was at fault in publishing the statement; (3) the statement tended to expose plaintiff to hatred, contempt and ridicule; (4) the statement was read by other persons or by the public; and (5) plaintiff's reputation was thereby damaged.

In short, a plaintiff may no longer rely on a presumption of damages in a per se libel case. There must be evidence of actual damages. *Nazeri,* 860 S.W.2d at 313; *Taylor v. Chapman,* 927 S.W.2d 542 (Mo.App. E.D.1996). Once a plaintiff offers evidence to support a finding on all the elements of MAI 23.06(1), including the existence of actual damages, he or she is entitled to damages of "such sum as ... will fairly and justly compensate the plaintiff for any damages ... he sustained as a direct result...." MAI 4.15 [1980 New].

There are few accusations more damaging or harmful to a young man's reputation than being called a sex offender or child molester. In the Jaspers' notice, Christopher Kennedy is specifically identified by name, address, age, hair and eye color, school and place of employment. The notice states he sexually molested a five year old boy. There are two references in capital letters that he is a SEX OFFENDER. These words reflect on Kennedy's integrity, character and good name and tend to expose him to public hatred, contempt and disgrace.

The Jaspers ultimately admitted preparing, printing and distributing the notice, thereby establishing their fault for its publication. There was evidence the notice was seen and read by numerous individuals. Others heard about its contents, and the Jaspers intended that the notice reach many people. They distributed the notice at a time

and place where Kennedy's father would be present, presumably to embarrass and humiliate him.

As a result of the publication of the notice, Kennedy was called "Chester Molester" at school, and he was denied access to visit with his infant son. There was some evidence some observers of the leaflets did not believe the charges. But there was also evidence some became believers, for example, those who referred to him as a molester.

There was evidence of expense for medical consultation with a psychiatrist, Dr. Beck, and for hospitalization following a connected suicide attempt. Dr. Beck testified that publication of the notice was the main cause of the suicide attempt and Kennedy would have future medical problems as a result of his mental stress. Kennedy also missed work during the time of his hospitalization. The award of $30,000 in actual damages was supported by evidence of publication, causation and actual damages.

The Jaspers' third point argues there was no substantial evidence to support the award of any punitive damages. In his cross-appeal, Kennedy contends that the award of only $25 in punitive damages was an abuse of trial court discretion.

Punitive damages serve to punish an actor and deter others from like conduct. In a defamation case, the trier of fact may award punitive damages if it finds the issues in favor of plaintiff and if it believes defendant published the defamatory notice with knowledge that it was false or with reckless disregard for whether it was true or false at a time when defendant had serious doubt as to whether it was true. MAI 4.15.

There was sufficient evidence to support the award of punitive damages. The statements were a product of relying solely on the unsupported statements of J.J. There was no physical evidence as corroboration of a J.J.'s story. There was testimony J.J. gave inconsistent versions of his statements. The Jaspers were aware of official investigations which found no merit to J.J.'s story and the absence of any support for their accusations. No criminal charges were filed against Kennedy after independent investigations by law enforcement and state social services offi-

cials. Nonetheless, ignoring their knowledge of these facts, the Jaspers became vindictive against Kennedy by following him, appearing at his residence and workplace, and finally by publishing statements which were vicious and untrue.

Moreover, there was evidence to support a finding Craig Jasper was conscious his acts were wrongful. He consented to the order for injunctive relief against further misconduct. He lied to law enforcement and counsel when he originally denied his involvement in the publication and distribution of the statements defaming Kennedy. At the time of publication, the Jaspers either knew the statements were false or, at a minimum, their conduct showed reckless disregard for whether the statements were true or false. Therefore, consideration of the award of punitive damages is warranted.

 Kennedy contends on his cross-appeal that the award of only $25 in punitive damages is an abuse of trial court discretion. In libel cases, a verdict will be set aside as inadequate for the same reasons that will justify the setting aside of a verdict for excessive damages. *Coats v. News Corporation*, 355 Mo. 778, 197 S.W.2d 958, 962 (1946). The verdict will not be set aside merely because of being greater or less than the court might deem proper, since there is no fixed measure of damages applicable to actions for defamation. *Id.* Punitive damages are not a matter of right but rest in the discretion of the [trier of fact]. *Id.*, 197 S.W.2d at 963. In a jury-waived case, therefore, awarding punitive damages and the amount of those damages are issues for the trial court. Unless it plainly appears there has been an abuse of such discretion, we are not justified in interfering with an assessment of punitive damages. *Seested v. Post Printing and Publishing Co.*, 326 Mo. 559, 31 S.W.2d 1045, 1054 (1930). We find no abuse.

We find nothing to support a conclusion of any prejudice or partiality on the part of the court.

We affirm.

RHODES RUSSELL, P.J., and SIMON, J., concur.